**[J-83-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| LAWRENCE S. SHOUL, | : | No. 64 MAP 2015 |
| | : | |
| Appellee | : | Appeal from the Order of the Adams |
| | : | County Court of Common Pleas, Civil |
| | : | Division, dated February 24, 2015, |
| v. | : | exited February 26, 2015, at No. 2014- |
| | : | S-721. |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | ARGUED: December 6, 2016 |
| DEPARTMENT OF TRANSPORTATION, | : | |
| BUREAU OF DRIVER LICENSING, | : | |
| | : | |
| Appellant | : | |

*Justice Todd delivers the Opinion of the Court, which Chief Justice Saylor and Justice Donohue join in full. Justice Wecht joins Parts I, II(B), and III of the opinion. Justices Baer and Dougherty join Parts I and II(B) of the opinion. Justice Mundy joins Parts I and II(A) of the opinion.*

## OPINION

**JUSTICE TODD**            **DECIDED: November 22, 2017**

In this appeal, we review the trial court's determination that 75 Pa.C.S. § 1611(e), providing that holders of commercial driver's licenses who are convicted of certain drug crimes while using motor vehicles are disqualified from holding such licenses for life, violates Pennsylvania's constitutional right to due process and the federal and Pennsylvania constitutional prohibitions on cruel and unusual punishment. After careful review, we reverse in part, vacate in part, and remand to the trial court for further proceedings.

### I. FACTUAL AND PROCEDURAL HISTORY

By way of statutory background, 75 Pa.C.S. § 1611(e) derives from Title XII of the Anti-Drug Abuse Act of 1986 – titled the Commercial Motor Vehicle Safety Act – as later amended by the Motor Carrier Safety Improvement Act of 1999.[1] These federal enactments, *inter alia*, established a statutory disqualification scheme whereby holders of commercial driver's licenses ("CDLs") who engaged in certain crimes while using motor vehicles were disqualified from holding CDLs for specified periods of time, and also required states to adopt many of its provisions to continue receiving federal highway funding.[2] In response, the General Assembly enacted the Uniform Commercial Driver's License Act,[3] the purpose of which is "to implement the Commercial Motor Vehicle Safety Act . . . and reduce or prevent commercial motor vehicle accidents, fatalities and injuries by," *inter alia*, "[d]isqualifying commercial drivers who have committed certain serious traffic violations or other specified offenses." 75 Pa.C.S. § 1602. In particular, the General Assembly adopted 75 Pa.C.S. § 1611, which requires Appellee, the Pennsylvania Department of Transportation ("PennDOT"), to manage Pennsylvania's parallel disqualification scheme. Section 1611 provides as follows, in pertinent part:

**§ 1611. Disqualification**

**(a) First violation of certain offenses.—**Upon receipt of a report of conviction, [PennDOT] shall, in addition to any other penalties imposed under this title, disqualify any person from driving a commercial motor vehicle . . . for a period of one year for the first violation of:

---

[1] *See* Pub. L. No. 99-570, 100 Stat. 2307 (1986), *as amended by* Pub. L. No. 106-159, 113 Stat. 1748 (1999), *codified at* 49 U.S.C. §§ 31301 *et seq.*

[2] *See* 49 U.S.C. §§ 31310(g), 3134; 49 C.F.R. §§ 383.51, 384.401.

[3] Act of May 30, 1990, P.L. 173, No. 42, *as amended by* Act of 2005, P.L. 100, No. 37, *codified at* 75 Pa.C.S. §§ 1601 *et seq.*

(1) [75 Pa.C.S. §] 3802 (relating to driving under influence of alcohol or a controlled substance . . . where the person was a commercial driver at the time the violation occurred;

\* \* \*

(7) any offense wherein the person caused the death of a person as a result of a motor vehicle accident through the  negligent operation of a commercial motor vehicle, including, but not limited to, a violation of 18 Pa.C.S. § 2504 (relating to involuntary manslaughter) or a violation of [75 Pa.C.S. §] 3732 (relating to homicide by vehicle).

\* \* \*

**(c) Two violations of certain offenses.—** . . . [PennDOT] shall disqualify for life any person convicted of two or more violations of any of the offenses specified in subsection (a) . . . arising from two or more separate and distinct incidents.

\* \* \*

**(d) Mitigation of disqualification for life.—**[PennDOT] may issue regulations establishing guidelines, including conditions, under which a disqualification for life under subsection (c) may be reduced to a period of not less than ten years, if such reductions are permitted by Federal regulations.

**(e) Disqualification for controlled substance offenses.—** [PennDOT] shall  disqualify any person from driving a commercial motor vehicle for life who is convicted of using a motor vehicle in the commission of any felony involving the manufacture, distribution or dispensing of a controlled substance or possession with intent to manufacture, distribute or dispense a controlled substance where either:

(1) the person was a [CDL] holder at the time of the commission of the felony; or

(2) the motor vehicle used in the commission of the felony was a commercial motor vehicle.

There shall be no exceptions or reductions to this disqualification for life.

\* \* \*

**(g) Disqualification for serious traffic offenses.—** [PennDOT] shall disqualify any person from driving a commercial motor vehicle for a period of 60 days if convicted of two serious traffic violations . . . arising from separate and distinct incidents occurring within a three-year period. A violation will only be considered a serious traffic violation for purposes of this subsection where:

(1) the person was a [CDL] holder at the time of the violation, and conviction of the violation results in a revocation, cancellation or suspension of the person's operating privileges for non[-]commercial motor vehicles; or

(2) the person was operating a commercial motor vehicle at the time of the violation.

*Id.* § 1611. It is the lifetime disqualification under subsection (e) that is the focus of this case.

Against this statutory backdrop, the factual and procedural history of this matter is relatively straightforward. In 2013, a Pennsylvania State Police informant asked Appellee Lawrence S. Shoul, who held a CDL, to retrieve marijuana from one of Appellee's co-workers and deliver it to the informant. Appellee obliged, using a motor vehicle to do so, whereupon he was arrested and charged with two counts of felony manufacture, delivery, or possession with intent to deliver a controlled substance, 35 P.S. § 780-113(a)(30), and ultimately convicted of the same.[4] Thereafter, PennDOT notified Appellee that, pursuant to Section 1611(e), he was disqualified from holding a CDL for life. Appellee appealed his disqualification to the trial court, asserting, as pertinent herein, that Section 1611(e): (1) violated his federal and Pennsylvania

---

[4] The record before us does not indicate the amount of marijuana, whether Appellee delivered the marijuana using a personal or commercial motor vehicle, or Appellee's sentence.

constitutional rights to substantive due process because it was not rationally related to promoting highway safety; and (2) violated the federal and Pennsylvania constitutional prohibitions on cruel and unusual punishment because, although it was formally a civil sanction, it was functionally a criminal punishment and was so irrational and disproportionate to his conduct as to be cruel and unusual. In response, PennDOT argued that Section 1611(e) was rationally related to promoting highway safety, as well as deterring drug trafficking and complying with certain federal highway funding requirements; and that it is both formally and functionally a civil sanction.

The trial court found that Section 1611(e) violated Pennsylvania's constitutional right to substantive due process and the federal and Pennsylvania constitutional prohibitions on cruel and unusual punishment. Specifically, concerning Appellee's claim that Section 1611(e) violated his right to substantive due process, the court did not address the federal constitutional issue, but agreed with Appellee that, as a Pennsylvania constitutional matter, statutes affecting one's right to hold a CDL must bear a rational relationship to a legitimate governmental objective, and that Section 1611(e) is not rationally related to promoting highway safety, reasoning that Appellee's conduct posed no danger thereto:

> [T]here is no suggestion that during the underlying incident [Appellee] was . . . under the influence of . . . marijuana or that he posed any safety hazard at all. No rational argument can be made that a CDL holder unlawfully delivering a controlled substance is likely to create a commercial vehicle highway safety hazard. It is more likely that a CDL holder unlawfully delivering marijuana will drive safely so as not to call law enforcement attention to himself.

Trial Ct. Op., 2/24/15, at 10-11 (footnote omitted). The court also opined that Section 1611(e) was not rationally related to highway safety because it was uniquely harsh

when compared to some of Section 1611's other disqualification provisions involving conduct it viewed as more dangerous to highway safety:

> [A] CDL holder who is operating a commercial vehicle while under the influence of marijuana is only subject to a one year disqualification. Similarly, a CDL holder who causes the death of another as a result of criminally negligent operation of a motor vehicle is likewise disqualified for one year. Only where a CDL holder has two or more of these convictions is he subject to a lifetime disqualification, and then he may seek reduction of that sanction to 10 years. Furthermore, a CDL holder convicted of two serious traffic violations only receives a 60-day disqualification. What appears clear is that the lifetime disqualification at issue is only tangentially related to highway safety if other factors are present, which do not appear in this case.

*Id.* at 11 (quotation marks and citations omitted). Finally, relying on then-Justice, later-Chief Justice Castille's rationale in his concurring opinion in *Nixon v. Commonwealth*, 839 A.2d 277 (Pa. 2003),[5] the court opined that Section 1611(e) was not rationally related to the promotion of highway safety because it failed to account for offenders' potential for rehabilitation:

> To paraphrase Justice Castille in *Nixon*, there may be offenses which are so severe that any reasonable person would agree that a lifetime ban from having a CDL is rational

---

[5] In *Nixon*, this court addressed a statute precluding certain former offenders, including those convicted of, *inter alia*, theft, from working in elder care facilities, but excepting offenders who had already been working on those facilities for at least one year at the time of the statute's enactment. *Nixon*, 839 A.2d at 289-90. Although this Court invalidated the statute on a different basis, Justice Castille authored a Concurring Opinion wherein he indicated his view that a statute precluding offenders convicted of certain, relatively minor, offenses from working in such facilities was not rationally related to protecting clients because it failed to account for their potential for rehabilitation. *See id.* at 291-92 (Castille, J., concurring) ("[I]t is difficult to discern a rational basis for automatically deeming an ancient conviction for theft . . . or for simple possession of a controlled substance . . . as eternally and retroactively prohibiting otherwise qualified care workers from continued employment in these facilities.").

and required. But it is difficult to find a rational basis for automatically concluding that unlawfully delivering marijuana creates such a safety issue that an individual, otherwise qualified to safely operate a commercial vehicle, should forever be denied employment in this field.

Trial Ct. Op., 2/24/15, at 11 (citations and footnotes omitted).

Turning to Appellee's claim that Section 1611(e) violated the federal and Pennsylvania constitutional prohibition on cruel and unusual punishment, the trial court noted that formally civil sanctions may nevertheless be functional criminal punishments according to the framework set forth in the United States Supreme Court's decision in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963). Applying that framework, the trial court found that Section 1611(e) was, in fact, functionally a criminal punishment and constituted cruel and unusual punishment.

PennDOT appealed directly to this Court,[6] raising three issues for our review:

    I.    Did the trial court fail to properly recognize legitimate legislative interests underlying the lifetime disqualification of [Appellee's CDL] for use of a motor vehicle in a felony violation of the Drug Act other than the reduction and prevention of commercial motor vehicle accidents?

    II.    Is the lifetime disqualification of a [CDL] under Section 1611(e) for conviction of a major Drug Act violation rationally related to highway safety, drug trafficking deterrence, and the continued receipt of federal highway funding?

    III.    Is the lifetime disqualification imposed under Section 1611(e) a civil collateral consequence of conviction

---

[6] *See* 42 Pa.C.S. § 722(a) (providing exclusive jurisdiction to this Court in "appeals from final orders of the courts of common pleas" in "[m]atters where the court of common pleas has held invalid as repugnant to the Constitution . . . of the United States, or to the Constitution of this Commonwealth . . . any statute of . . . this Commonwealth").

for a major drug trafficking violation rather than a criminal penalty?

PennDOT's Brief at 3.

## II. ANALYSIS[7]

### A. Substantive Due Process

In PennDOT's first two issues, it challenges the trial court's determination that Section 1611(e) violates Appellee's right to substantive due process under the Pennsylvania Constitution. Before addressing the arguments of the parties, we begin with a discussion of due process principles. While the claim before us is grounded in the state constitution, because our cases have found guidance from the similar federal right, we offer a brief explication of that right. The Fourteenth Amendment to the United States Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV. The United States Supreme Court has held that this prohibition contains not only a procedural component protecting persons against arbitrary and unjust proceedings, *see*, *e.g.*, *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306 (1950) (noting that the fundamental requirement of procedural due process is notice and an opportunity to be heard), but also a substantive component protecting persons against arbitrary and unjustified laws, *see*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967) (holding that substantive due process protected ethnically diverse spouses from statute forbidding ethnically diverse marriages); *Williamson v. Lee Optical Co.*, 348 U.S. 483 (1955) (holding that substantive due process did not protect unlicensed eye care professionals against statute requiring licensure for preparation and sale of eyeglasses). The state

---

[7] Because each of PennDOT's issues implicates Section 1611(e)'s constitutionality, a pure question of law, our standard of review is *de novo* and our scope of review is plenary. *Robinson Twp., Washington Cnty. v. Commonwealth*, 83 A.3d 901, 943 (Pa. 2013).

counterpart is Article I, Section 1 of the Pennsylvania Constitution, which provides that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." Pa. Const., art. I, § 1. This Court has held that this guarantee likewise protects persons against arbitrary and unjust laws. Claims that a statute violates either the federal or state right to substantive due process are subject to the following "means-end review":

> [C]ourts must weigh the rights infringed upon by the law against the interest sought to be achieved by it, and also scrutinize the relationship between the law (the means) and that interest (the end). Where laws infringe upon certain rights considered fundamental, such as the right to privacy, the right to marry, and the right to procreate, courts apply a strict scrutiny test. Under that test, a law may only be deemed constitutional if it is narrowly tailored to a compelling state interest.
>
> Alternatively, where laws restrict . . . other rights . . . which are undeniably important, but not fundamental, . . . courts apply a rational basis test.

*Nixon*, 839 A.2d at 286-87 & n.15 (collecting federal and state cases).

Thus, while statutes abridging fundamental rights are subject to strict scrutiny and are constitutional only where they are narrowly tailored to a compelling governmental interest, statutes limiting other rights are subject to a rational basis test. Notably, the federal rational basis test differs significantly from our own in terms of the degree of deference it affords to legislative judgment. The high Court has described its rational basis test, albeit in the context of a claim that a statute violated the Fourteenth Amendment's Equal Protection Clause, as broadly deferential:

We many times have said . . . that rational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. . . . [A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. A legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data. A statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.

*Heller v. Doe*, 509 U.S. 312, 319–21 (1993) (citations, brackets, and quotation marks omitted).

This Court, by contrast, applies what we have deemed a "more restrictive" test. *Nixon*, 839 A.2d at 287 n.15. Specifically,

a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the

objects sought to be attained. Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts.

*Gambone v. Commonwealth*, 101 A.2d 634, 636-37 (Pa. 1954) (citation and footnotes omitted); *see also Nixon*, 839 A.2d at 287-88 & n.15 (distinguishing the federal test from the state test). Thus, under our state charter, we must assess whether the challenged law has "a real and substantial relation" to the public interests it seeks to advance, and is neither patently oppressive nor unnecessary to these ends. Nevertheless, we bear in mind that, although whether a law is rationally related to a legitimate public policy is a question for the courts, the wisdom of a public policy is one for the legislature, and the General Assembly's enactments are entitled to a strong presumption of constitutionality rebuttable only by a demonstration that they clearly, plainly, and palpably violate constitutional requirements. *Id.* at 285-86.[8]

Herein, PennDOT argues that the trial court erred in determining that Section 1611(e) was not rationally related to promoting highway safety and, in any event, in failing to recognize that it is rationally related to legitimate governmental objectives: deterring drug crime and complying with federal highway funding requirements.

---

[8] The concurrence views *Gambone*'s formulation of the rational basis test as a remnant of the oft-derided "*Lochner* era" of federal substantive due process jurisprudence and inconsistent with modern jurisprudential understanding of legislative capacity and authority. Critically, however, the parties do not dispute the applicability of the *Gambone* test to Appellee's challenge to Section 1611(e). Accordingly, in our view, any reconsideration of *Gambone*, and, more recently, *Nixon*, must await a future case, with developed advocacy.

Specifically, PennDOT posits that Section 1611(e) is rationally related to promoting highway safety because it protects motorists from "operators of large [commercial motor vehicles who] exercise poor judgment and risky behavior by committing major drug offenses using motor vehicles." PennDOT's Brief at 16. PennDOT rejects the trial court's determination that a driver delivering marijuana is likely to drive cautiously as "strain[ing] credulity and miss[ing] the point": that "[t]he lifetime ban is imposed because the drug trafficking . . . while using a vehicle reflects extreme bad judgment and risky behavior and the possibility of further bad [judgment] and risky behavior when behind the wheel of a forty-ton, 100 foot long truck." *Id.* at 19. PennDOT further assails the trial court's reliance on the reasoning underlying Chief Justice Castille's concurrence in *Nixon*, asserting that whether dangerous conduct is predictive of future dangerous conduct is a question for the legislature, and further suggesting that *Nixon* is inapposite because Section 1611(e) is not retroactive and involves the privilege of a CDL. PennDOT also rejects the trial court's view of Section 1611(e)'s severity as undermining its rational connection to highway safety, arguing that variations among Section 1611's disqualification provisions "only show that the program was well thought through . . . with varying sanctions based on the offense," and that the proper severity of any particular sanction is a legislative question. *Id.* at 20.

In the alternative, PennDOT offers that Section 1611(e) is rationally related to protecting against drug trafficking and drug use by deterring the same. To that end, PennDOT relies heavily on this Court's decision in *Plowman v. Dept. of Trans., Bureau of Driver Licensing*, 635 A.2d 124 (Pa. 1993) (upholding statute imposing 90-day to 2-year driver's license suspension for possession of a controlled substance as protecting against the proliferation of drug use by deterring the same).

Finally, PennDOT submits that Section 1611(e) is rationally related to the legitimate government objective of continuing to obtain full federal highway funding, estimating that, absent its enactment, the state would lose approximately $56.7 million in such funding in the first year and $113.4 million in subsequent years, and noting that those funds empower PennDOT to carry out its governmental duties. *See* PennDOT's Brief at 18.

Appellee, by contrast, argues that the trial court correctly found that Section 1611(e) was not rationally related to any legitimate governmental objective. Regarding the promotion of highway safety, Appellee, largely tracking the trial court's analysis, posits that it is "undeniable that the commission of a single drug act violation does not directly implicate highway safety" and contends that, because Section 1611(e) sanctions other, more dangerous behavior less severely, it is unreasonable, unduly oppressive, and patently beyond the necessities of promoting highway safety. Appellee's Brief at 6. Regarding the deterrence of drug trafficking and drug use, Appellee claims that Section 1611(e)'s failure to provide a graduated system of sanctions, or method for reinstatement after disqualifications, based on drug crime makes it more likely to *promote* such crime than to deter it:

> From a purely logical perspective . . . the lack of a graduated punishment scheme violates the baseline principle of proportionality. A CDL holder who is predisposed to traffic in drugs, realizing that . . . he faces the same consequences whether he moves a full trunk or a full trailer may, in fact, be incentivized to opt for the more lucrative option of using his commercial motor vehicle to transport the drugs. Alternatively, a commercial driver whose CDL has been disqualified for life may decide that he should apply his training as a truck driver to further drug trafficking; [Section] 1611(e) no longer has any teeth with regard to such an individual.

*Id.* at 8 (footnote omitted).

Finally, Appellee concedes that Section 1611(e) is related to, and indeed necessary to, continuing to receive federal highway funding, but asserts that sanctioning such an objective as satisfying the requirements of substantive due process undermines state constitutional guarantees:

> This argument, were it valid and taken to its logical conclusion, would permit the General Assembly to disregard the Pennsylvania Constitution in any situation, to pass any law the federal government demanded, so long as it would lead to the Commonwealth's receipt of federal funding. This cannot be the law. The Commonwealth of Pennsylvania must be and is limited in its actions by the Pennsylvania Constitution. An interest in the receipt of federal funding cannot, by itself, save a law that is otherwise repugnant to the Pennsylvania Constitution.

*Id.* at 9.

As detailed above, the question of whether Section 1611(e) violates the right to substantive due process under the Pennsylvania Constitution implicates an evaluation of the law's *means* – i.e., its disqualification of Appellee's holding a CDL for life – against its *ends* – i.e., its policy goals of protecting highway safety, deterring drug crime, and complying with federal highway funding requirements. Where, as here, there is no claim that the law impacts a fundamental right, we need not consider whether Section 1611(e) is narrowly tailored to meet a compelling governmental interest; rather, we need only determine whether it is rationally related to its interest – that is, whether it has a real and substantial relation to the public interests it seeks to advance, and is neither patently oppressive nor unnecessary to these ends. *Gambone*, 101 A.2d at 636-37.

Preliminarily, we agree with the trial court that Section 1611(e) is not rationally related, at least as a matter of Pennsylvania constitutional jurisprudence, to the protection of highway safety. As the trial court reasoned, the mere delivery of a controlled substance does not, by itself, pose a direct or substantial risk to highway

safety. Moreover, although PennDOT's creative argument that persons who deliver controlled substances are predisposed to poor judgment and risky behavior, which inferentially includes poor judgment and risky behavior that *does* pose a risk to highway safety, might be sufficient to satisfy the federal constitution's requirements, it is too abstract and attenuated to satisfy Pennsylvania's constitutional requirements that a law bear a "real and substantial relation to the objects sought to be attained." *Id.* at 637. Indeed, PennDOT's argument in this regard ultimately rests on the proposition that persons who engage in *any* poor judgment or risky behavior are of such risk to highway safety as they might reasonably be barred from driving, a proposition we do not accept.

Furthermore, we find merit in the trial court's view that Section 1611(e)'s severity, relative to Section 1611's other sanctions for conduct plainly more dangerous to highway safety, undermines the notion that it is rationally related to that purpose: simply stated, a law which plainly goes too far allegedly in pursuit of some legitimate purpose may reflect arbitrariness or may betray other, unspoken purposes, a principle plainly contemplated by the *Gambone* test. *See id.* ("[A] law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case. . . . Under the guise of protecting the public interests the legislature may not arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupations."). As the trial court reasoned, Section 1611(e) stands out as the sole provision imposing a lifetime disqualification from holding a CDL that may never be lifted, while holders of CDLs who commit traffic violations, drive under the influence of alcohol and/or drugs, or even cause negligent homicides – all plainly more dangerous, injurious, or fatal to motorists – are subject to significantly shorter-term disqualifications; even repeat offenders subject to lifetime disqualification may seek exceptions and reductions in the length of their

disqualifications. Thus, as the trial court opined, Section 1611 quizzically sanctions perhaps the least risky conduct (relative to highway safety) it regulates with the greatest severity, suggesting it is either harsh for no reason, or for some ulterior reason.

We reject PennDOT's arguments to the contrary. First, although variation in a statute's sanctions relative to particular conduct might reasonably demonstrate thorough consideration, it is not Section 1611's variation which calls its relationship to highway safety into question; rather, it is the apparent disjunct between Section 1611's lifetime disqualification for conduct which is not, in and of itself, dangerous to highway safety and Section 1611's less onerous sanctions for conduct that poses greater risks and, in some circumstances, actually injures (or even kills) motorists. Moreover, although PennDOT is correct that, whether a particular sanction is justified for particular conduct is a legislative question in the first instance, it is beyond peradventure that the legislature's determination is subject to judicial review for compliance with constitutional requirements, including the *Gambone* test. *Id.* ("The question [of] whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts.").

Furthermore, we likewise agree with the trial court that Section 1611(e)'s imposition of a *lifetime* disqualification undermines its rational relationship to promoting highway safety: as Chief Justice Castille explained in *Nixon*, a law which fails to account for persons' inherent potential for rehabilitation may well be "unreasonable," "unduly oppressive," or "patently beyond the necessities of" its regulatory aims. *Id.* Presently, Section 1611(e) operates on the principle that one's use of a motor vehicle to deliver a controlled substance not only poses such a risk to highway safety as to justify

the disqualification of his right to hold a CDL, but also an irrefutable legislative determination that he will *always* pose such a risk to highway safety as to justify the same. We agree with the trial court and Appellee that this is an unreasonable conclusion.

However, we ultimately must agree with PennDOT that the trial court overlooked the fact that Section 1611(e) serves the legitimate governmental purpose of deterring drug activity. As PennDOT argues, this Court's decision in *Plowman* stands for the proposition that the suspension of a driver's license is rationally related, at least as a matter of federal constitutional jurisprudence,[9] to protecting against the conduct giving rise to the suspension – therein, possession of a controlled substance – by deterring it. *See Plowman*, 635 A.2d at 127 ("[T]he prospect of losing one's driver's license may deter a potential drug user from committing [a] drug offense. At least, that potential user may consider the loss of his/her license and its effect on employment and transportation prior to committing a drug offense."). We find this rationale persuasive as a matter of Pennsylvania constitutional jurisprudence as well. Plainly, just as the suspension of a driver's license for possession of a controlled substance might influence a would-be possessor of drugs not to possess them, Section 1611(e)'s lifetime disqualification from holding a CDL for delivery of a controlled substance while using a motor vehicle might influence a would-be drug trafficker not to traffic drugs or, at minimum, to do so without a vehicle. Appellee's argument to the contrary – that Section 1611(e)'s lack of a graduated system of sanctions actually incentivizes would-be drug traffickers to traffic larger quantities of drugs at a single time – is too clever by half: the question is not

---

[9] In *Plowman*, the parties agreed that the federal and Pennsylvania constitutional guarantees of substantive due process were coterminous. Notably, *Plowman* was decided before *Nixon*, which dispelled that notion. *See Nixon*, 839 A.2d at 287 n.15.

whether the statute bears a real and substantial relationship to persuading drug traffickers to minimize the amount of contraband they are carrying, but, rather, to persuading holders of CDLs to avoid drug trafficking altogether.[10]  We find that the legislature was free to conclude that it might.[11]

Accordingly, we hold that Section 1611(e) does not violate Appellee's Pennsylvania constitutional right to substantive due process.

### B. Cruel and Unusual Punishments

In PennDOT's final issue, it challenges the trial court's determination that Section 1611(e) violates the federal and Pennsylvania constitutional prohibitions on cruel and unusual punishments.  The Eighth Amendment to the United States Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const., amend. VIII.[12] [13]  Although the

---

[10] Moreover, taking Appellee's argument to its natural end, a statute's failure to provide gradations (or gradations within those gradations) in its sanctions would similarly render it an irrational deterrent, essentially requiring that the legislature invent a vast spectrum of sanctions for an equally vast panoply of circumstances attendant prohibited conduct. We do not view the due process clause as imposing such a requirement.

[11] Because we find that Section 1611(e) is rationally related to the legitimate governmental interest of deterring drug trafficking, we need not consider whether its relationship to federal highway funding requirements is sufficient to satisfy the requirements of Pennsylvania's substantive due process doctrine.

[12] This prohibition applies to both the federal government and, via the Fourteenth Amendment's guarantee of due process, to state governments.  *See Jurek v. Texas*, 428 U.S. 262 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Gregg v. Georgia*, 428 U.S. 153 (1976).

[13] Similarly, Article I, Section 13 of the Pennsylvania Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted."  Pa. Const., art. I, § 13.  Because the parties proceed from the view that the Eighth Amendment and Article I, Section 13 are coextensive and present arguments predicated only on Eighth Amendment jurisprudence, we consider only the Eighth Amendment's prohibition on cruel and unusual punishments herein.  *But see Commonwealth v. Baker*, 78 A.3d 1044, 1056 (Pa. 2013) (Castille, C.J., concurring) (continued…)

latter clause is limited, by its terms, to "punishments," the trial court and the parties differ as to that term's scope. Below, the trial court analyzed Appellee's claim under the *Mendoza-Martinez* factors, concluding that Section 1611(e) constitutes punishment, and, before us, PennDOT advocates the same approach. Appellee, by contrast, argues that the trial court's application of the factors was flawed, and, in the alternative, contends that Section 1611(e) is punishment pursuant to the high Court's decision in *Austin v. United States*, 509 U.S. 602 (1993), which held that the term extends to any sanction intended, at least in part, to punish or deter criminal conduct.

After careful review, we agree with Appellee that *Austin* provides the appropriate framework and that Section 1611(e) constitutes punishment because it, at least in part, exacts retribution or deters crime. Admittedly, the high Court has long employed the *Mendoza-Martinez* framework in myriad areas of federal constitutional jurisprudence, arguably including Eighth Amendment jurisprudence, to determine whether a formally civil sanction is functionally punitive in nature. *See*, *e.g.*, *Trop v. Dulles*, 356 U.S. 86 (1958) (plurality) (considering claim that punishing military deserters with expatriation violated the Eighth Amendment's prohibition on cruel and unusual punishments and applying a purpose-based standard presaging the *Mendoza-Martinez* framework); *United States v. Ward*, 448 U.S. 242 (1980) (considering claim that formally civil penalties imposed for spilling oil into navigable waters were functional criminal punishments, implicating the Fifth Amendment's privilege against self-incrimination and applying the *Mendoza-Martinez* framework); *Smith v. Doe*, 538 U.S. 84 (2003) (considering claim that sexual offender registration requirements were functional

_____

(…continued)
(offering distinctions between the Eighth Amendment and Article I, Section 13); *Commonwealth v. Eisenberg*, 98 A.3d 1268, 1282-83 (Pa. 2014) (same).

criminal punishments implicating the federal constitutional *Ex Post Facto* Clause and applying the *Mendoza-Martinez* framework)*.*

However, it is apparent that *Austin* retreated from that practice in the context of Eighth Amendment challenges.  In *Austin*, the court considered a claim that a state civil forfeiture law violated the Eighth Amendment's prohibition on excessive fines, and the government argued that the statute's civil sanctions were not "punishment" according to the *Mendoza-Martinez* factors, and, thus, were outside the Eighth Amendment's scope. *Austin*, 509 U.S. at 604-607.  The high Court first rejected the government's premise that *Mendoza-Martinez* defined that scope as inconsistent with the fact that the text and history of the Eighth Amendment, unlike that of other constitutional prohibitions, drew no distinction between civil and criminal "punishment":

> Some provisions of the Bill of Rights are expressly limited to criminal cases.  The Fifth Amendment's Self-Incrimination Clause, for example, provides: "No person . . . shall be compelled in any criminal case to be a witness against himself."  The protections provided by the Sixth Amendment are explicitly confined to "criminal prosecutions."  The text of the Eighth Amendment includes no similar limitation.

> Nor does the history of the Eighth Amendment require such a limitation.  Justice [O'Connor] noted in [*Browning Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989)]: "Consideration of the Eighth Amendment immediately followed consideration of the Fifth Amendment. After deciding to confine the benefits of the Self-Incrimination Clause of the Fifth Amendment to criminal proceedings, the Framers turned their attention to the Eighth Amendment. There were no proposals to limit that Amendment to criminal proceedings."   [The Eighth Amendment's predecessor,] Section 10 of the English Bill of Rights of 1689 is not expressly limited to criminal cases either.  The original draft of § 10 as introduced in the House of Commons did contain such a restriction, but only with respect to the bail clause: "The requiring excessive Bail of Persons committed in

criminal Cases, and imposing excessive Fines, and illegal Punishments, to be prevented." The absence of any similar restriction in the other two clauses suggests that they were not limited to criminal cases. In the final version, even the reference to criminal cases in the bail clause was omitted.

*Id.* at 607-609 (citations and quotation marks omitted). Moreover, the court intimated that such a distinction was inconsistent with the Eighth Amendment's purpose of "limit[ing] the government's power to punish":

> The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law. It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. Thus, the question is not . . . whether forfeiture . . . is civil or criminal, but rather whether it is punishment.

*Id.* at 609-10 (citations and quotation marks omitted). In a footnote, the court sharpened the point, observing that the government's reliance on *Mendoza-Martinez* (and *Ward*) was "misplaced":

> The question in those cases was whether a nominally civil penalty should be reclassified as criminal and the safeguards that attend a criminal prosecution should be required. . . . In addressing the separate question whether punishment is being imposed, the Court has not employed the tests articulated in *Mendoza-Martinez* and *Ward*. Since in this case we deal only with the question whether the Eighth Amendment's Excessive Fines Clause applies, we need not address the application of those tests.

*Id.* at 610 n.6 (some citations and quotation marks omitted). Finally, the Court explained the proper scope of Eighth Amendment "punishment" as including sanctions intended in any respect to exact retribution for, or to deter, conduct:

> We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause. We, however,

must determine that it can only be explained as serving in part to punish. . . . [A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.

*Id.* at 610.

Thus, following *Austin*, although *Mendoza-Martinez* remains salient for determining whether a formally civil sanction is functionally a criminal punishment, implicating constitutional rights attendant criminal proceedings, it is inapplicable in determining whether a sanction is, for purposes of the Eighth Amendment, "punishment," which includes all civil or criminal sanctions that serve retributive or deterrent purposes to any degree.[14]

---

[14] In her Concurring and Dissenting Opinion, Justice Mundy notes that this formulation of the Eighth Amendment's scope in *Austin* derives from *Halper*, and that the Court in *Halper* adopted two contrary tests for determining if a civil sanction is punishment within the meaning of the federal constitutional prohibition on double jeopardy: (1) that only solely remedial sanctions are not punishment; and (2) that only solely deterrent sanctions are punishment. *See* Concurring and Dissenting Opinion (Mundy, J.), at 2-4. Justice Mundy contends that the high Court in *Hudson v. United States*, 522 U.S. 93 (1997) – a double jeopardy case – retreated from the former test in favor of the latter, on the ground that the former test would designate virtually all civil sanctions as punishment. *See* Concurring and Dissenting Opinion (Mundy, J.), at 4-5. Justice Mundy urges that this Court should similarly retreat from the former test for purposes of determining whether a civil sanction is punishment within the meaning of the constitutional prohibition on cruel and unusual punishments, reiterating that a contrary holding would designate virtually all civil sanctions as punishment within the meaning of that constitutional prohibition. *Id.* at 5.

Respectfully, we view *Austin*'s pronouncement that civil sanctions intended at least in part to occasion deterrence or retribution are punishment for Eighth Amendment purposes as authoritative notwithstanding *Hudson*, and appropriately situated to that context in light of the differences, detailed in *Austin*, between double jeopardy and cruel and unusual punishment doctrine. *See Austin*, 509 U.S. at 607-10. Preliminarily, *Hudson* was a double jeopardy case, not an Eighth Amendment case, and thus, unsurprisingly, *Austin*'s pronouncement was not overruled in *Hudson*. Moreover, as the court explained in *Austin*, while the constitutional restrictions on double jeopardy apply only to "criminal" punishments – rendering *Hudson*'s focus on solely deterrent civil sanctions an arguably appropriate benchmark – the constitutional prohibition on cruel (continued…)

Applying *Austin*, it is clear that Section 1611(e) is punishment. Even assuming *arguendo* that Section 1611(e) is not intended to exact retribution against felony drug offenders, it is unquestionably meant to deter drug crime. Indeed, as noted *supra*, Section 1611(e) derives from the Commercial Motor Vehicle Safety Act of 1986, which was itself a constituent part of the Anti-Drug Abuse Act of 1986, P.L. No. 99-570, 100 Stat. 3207, legislation directed at curtailing drug cultivation, trafficking, and abuse, among other purposes. *See id.* Plainly, Section 1611(e) deters drug crime not only by preventing persons previously convicted of drug offenses (who are presumed to be

(…continued)

and unusual punishments applies to all punishments, justifying a focus on sanctions with any deterrent effect. Indeed, in *Hudson* and subsequent cases, the high Court has highlighted the distinction and contemplated that the scope of the civil sanctions implicating the prohibition on double jeopardy was narrower than that for the Eighth Amendment prohibition on cruel and unusual punishments. *See Hudson*, 522 U.S. at 495 (opining that double jeopardy doctrine need not be so broad in light of the more expansive scope of other provisions, including the Eighth Amendment, citing *Austin*); *United States v. Usery*, 518 U.S. 267, 286 (1998) (noting that *Austin* did not involve double jeopardy and that the court has never understood the scope of the Eighth Amendment as "parallel to, or even related to" the constitutional prohibition on double jeopardy); *United States v. Bajakajian*, 524 U.S. 321, 329 & n.4 (rejecting the government's argument that an *in personam* forfeiture of cash was not a punishment because forfeiture also served remedial purposes, opining that, even if it did serve remedial purposes, "the forfeiture would still be punitive in part").

In addition, we note that *Austin* does not sweep all civil sanctions within its ambit, but, rather, only those intended, at least in part, to incentivize primary conduct. For example, although a driver's license suspension predicated on a motorist's driving under the influence of alcohol is plainly intended both to protect the community from a potentially inebriated motorist *and* to incentivize the motorist not to drive under the influence in the future, a driver's license suspension predicated on a motorist's inability to pass a vision exam is intended only to protect the community, not to incentivize the driver to have better vision. *Compare* 75 Pa.C.S. §§ 3801–3804 *with* 67 Pa. Code § 83.3. Contrariwise, we note that virtually all sanctions, including imprisonment, which are unquestionably punishment, have a remedial component in that they are ultimately intended to remove dangerous individuals from, or ameliorate the risk of danger to, society and to provide for the rehabilitation of offenders. The high Court has not embraced an interpretation of the Eighth Amendment that would permit punishments to be inflicted in a manner grossly disproportionate to the underlying offenses simply because they are also meant to achieve non-punitive, non-deterrent ends.

likely to commit the same offenses again) from using commercial motor vehicles to engage in drug trafficking, but also, as detailed above, by attempting to influence holders of CDLs not to engage in drug crime in the first instance – *i.e.,* deterring them. [15]

---

[15] In her Concurring and Dissenting Opinion, Justice Mundy notes that, in *Plowman, supra*, this Court previously determined that a driver's license suspension predicated on a drug offense is not a punishment for Eighth Amendment purposes. Concurring and Dissenting Opinion (Mundy, J.), at 1-2 (citing *Plowman, supra*). Respectfully, this Court's discussion of the issue was as follows, *in toto*:

> Finally, Appellee argues, as she successfully did before the trial court, that the mandatory suspension of one's driver's license as a civil sanction for a drug conviction constitutes "cruel and unusual punishment" under both the Eighth Amendment to the United States Constitution and Article 1, Section 13 of the Pennsylvania Constitution. The underpinning for her position is that the suspension of her license is a criminal penalty. Because we disagree with her characterization of the sanction imposed, we cannot accept her conclusion. (Although [the statute providing for the suspension] is included in the Crimes Code, that, in and of itself, does not make the penalty imposed a criminal punishment.) [The statute] is merely a civil consequence of a criminal violation. Furthermore, no discretion exists in its application as PennDOT is required to suspend a driver's license upon proper notification of a conviction. For these reasons, we hold that Section 13(m) of the Act does not violate either the Eighth Amendment of the United States Constitution or Article 1, Section 13 of the Pennsylvania Constitution.

*Plowman*, 635 A.2d at 127–28. Additionally, in a footnote, we remarked that, even if we were to find the suspension to be a criminal punishment, we would find that it was not grossly disproportionate to the underlying offense or arbitrarily inflicted for the purpose of causing pain and suffering. *Id.* at 127 n.3.

Thus, the court's substantive analysis of the issue was a mere two sentences long, did not support its determination that the license suspension was not punishment by resort to any legal authority, made no mention of *Austin* (or any other governing case), and was buttressed by an alternative holding that the sanction was not cruel and unusual. Accordingly, we are inclined to find *Plowman* of little precedential value on this point, particularly in light of *Austin*'s apparent reformulation of the principles attendant the scope of the constitutional prohibition on cruel and unusual punishments.

Nevertheless, that determination does not answer the question of whether Section 1611(e) is a *cruel and unusual* punishment. A claim that a particular punishment is cruel and unusual is evaluated according to the tripartite test set forth in *Solem v. Helm*, 463 U.S. 277 (1983), which this Court has described as follows:

> The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences which are grossly disproportionate to the crime. . . .
>
> . . . The [*Solem* test] examines: (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions. . . . [A] reviewing court is not obligated to reach the second and third prongs of the test unless a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.

*Commonwealth v. Baker*, 78 A.3d 1044, 1047 (Pa. 2013) (internal quotation marks omitted). Additionally, in *Commonwealth v. 1997 Chevrolet & Contents Seized from Young*, ___ A.3d ___, 2017 WL 2291733 (Pa. May 25, 2017), this Court recently expounded further on the appropriate considerations attendant a determination of whether a sanction constituting Eighth Amendment "punishment" — there, civil forfeiture of instrumentalities of crime — is grossly disproportionate to the related crime. Specifically, noting that the United States Supreme Court has largely left it to lower courts to further develop the intricacies of the gross disproportionality inquiry, we catalogued myriad factors relevant to determining the harshness of a particular penalty — including, *inter alia*, the objective and subjective value of the property forfeited to the owner and third parties, such as whether forfeiture would deprive the property owner of his livelihood — as well as factors salient in determining the gravity of an offense —

including, *inter alia*, the nature of the offense, the offender's sentence as compared to the maximum available sentence for the offense, the regularity of the defendant's criminal conduct, and any actual harm arising from the offense other than a "generalized harm to society." *Id.* at ___, 2017 WL 2291733 at *27.

Finally, the question of whether a particular punishment is appropriate to a particular crime "[b]elong[s] in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336 (citing *Solem*, 463 U.S. at 290 ("Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes.")). Consistent with that admonition, the high Court has offered the following summary of its "gross disproportionality" decisions:

> Under this approach, the Court has held unconstitutional a life without parole sentence for the defendant's seventh nonviolent felony, the crime of passing a worthless check. *Solem*[, *supra*]. In other cases, however, it has been difficult for the challenger to establish a lack of proportionality. A leading case is *Harmelin v. Michigan*, 501 U.S. 957 (1991), in which the offender was sentenced under state law to life without parole for possessing a large quantity of cocaine. A closely divided Court upheld the sentence. . . . Again closely divided, the Court rejected a challenge to a sentence of 25 years to life for the theft of a few golf clubs under California's so-called three-strikes recidivist sentencing scheme. *Ewing v. California*, 538 U.S. 11 (2003); see also *Lockyer v. Andrade*, 538 U.S. 63 (2003). The Court has also upheld a sentence of life with the possibility of parole for a defendant's third nonviolent felony, the crime of obtaining money by false pretenses, *Rummel v. Estelle*, 445 U.S. 263 (1980), and a sentence of 40 years for possession of marijuana with intent to distribute and distribution of marijuana, *Hutto v. Davis*, 454 U.S. 370 (1982) (*per curiam*).

*Florida v. Graham*, 560 U.S. 48, 59-60 (2010).

Turning to the instant case, we find that the record is insufficiently developed to determine whether Section 1611(e)'s application to Shoul was grossly disproportionate

to his crime, particularly in light of our intervening decision in *1997 Chevrolet*. Notably, the evidentiary record contains little detail concerning the facts of Shoul's offense, the impact of the loss of his CDL, his sentence as compared to the maximum sentence he faced, or the actual harmful consequences resulting from his offense. Moreover, neither the trial court, nor Appellee in his brief, have offered meaningful analysis of the issue. Indeed, the trial court appeared to erroneously conclude that its threshold determination that Section 1611(e) was "punishment" within the meaning of the Eighth Amendment was dispositive of Appellee's claim, and, although it remarked in its analysis of Appellee's substantive due process claim that Section 1611(e) appeared excessive to the purpose of protecting highway safety and excessive in comparison to Section 1611's other sanctions, it did not recite or apply the *Solem* test in any respect. Appellee, likewise terse, baldly argues in his appellate brief that Section 1611(e)'s "imposition of an eternal ban from practicing one's profession is grossly disproportionate to the severity of a single drug act violation," and offers no substantive reasoning in support of that allegation. Appellee's Brief at 18-19.[16] Moreover, insofar as the proceedings below pre-dated *1997 Chevrolet*, neither the parties nor the lower court had the benefit of its guidance to develop a comprehensive exposition of the harshness of Section 1611(e)'s application to Shoul or the severity of his offense, or to weigh one against the other. In our view, in light of the bare record, and our refinement of the gross disproportionality standard in *1997 Chevrolet*, the appropriate course is to vacate the trial court's order and remand to that court for further proceedings on the question of whether Section 1611(e)'s sanction is grossly disproportionate to Shoul's offense.

---

[16] Appellee also contends that Section 1611(e) "runs contrary to public policy," in that it stigmatizes former offenders. Appellee's Brief at 19 (citing *Secretary of Revenue v. John's Vending Corp.*, 309 A.2d 358, 362 (Pa. 1973)). Appellee's contention in this regard is outside the scope of the issues raised in this appeal.

### III. CONCLUSION

Accordingly, we reverse the trial court's order insofar as it held that Section 1611(e) violates the Pennsylvania constitutional right to substantive due process, we vacate the trial court's order insofar as it held that Section 1611(e) violates the federal and state constitutional prohibitions on cruel and unusual punishment, and we remand to the trial court for further proceedings consistent with this opinion.

Jurisdiction relinquished.

Chief Justice Saylor and Justice Donohue join the opinion in full.

Justice Wecht joins Parts I, II(B), and III of the opinion and files a concurring opinion.

Justice Dougherty joins Parts I and II(B) of the opinion and files a concurring and dissenting opinion in which Justice Baer joins.

Justice Mundy joins Parts I and II(A) of the opinion and files a concurring and dissenting opinion.