IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING | : | No. 45 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 815 CD |
| Appellant | : | 2017 dated October 31, 2018 Affirming |
| | : | the Order of the Delaware County Court |
| | : | of Common Pleas, Civil Division, at No. |
| v. | : | 2016-008188 dated May 19, 2017, |
| | : | exited May 22, 2017. |
| | : | |
| STEPHEN MIDDAUGH, | : | ARGUED:  MARCH 10, 2020 |
| | | |
| Appellee | | |

***OPINION***

**CHIEF JUSTICE SAYLOR**                           **DECIDED:  January 20, 2021**

We allowed appeal to determine whether the Department of Transportation (PennDOT) was precluded from suspending an individual's driving privileges based on a DUI conviction, where there was a lengthy delay between the conviction and the time the driver was notified of the suspension.

**I.**

In March 2014, Appellee was convicted in the Delaware County common pleas court of driving under the influence ("DUI") pursuant to Section 3802(a)(2) of the Vehicle Code.  *See* 75 Pa.C.S. §3802(a)(2) (relating to "general impairment" and prohibiting the operation of a vehicle if the driver has a blood-alcohol content between 0.08% and

0.10% within two hours after driving).[1]  The Delaware County Office of Judicial Support – the equivalent in that county of a court clerk's office, *see Middaugh v. PennDOT*, 196 A.3d 1073, 1075 & n.5 (2019) – was required to send PennDOT a record of the conviction within ten days after its occurrence.  *See* 75 Pa.C.S. §6323(1)(i).  For reasons that remain unclear, that office waited until early August 2016, twenty-eight months after the ten-day deadline had passed, to notify PennDOT of the conviction. When PennDOT received the notification, it sent Appellee a letter, dated August 23, 2016, informing him that his driving privileges would be suspended for one year beginning in late September 2016.  *See id.* §3804(e) (relating to the suspension of operating privileges upon conviction of a predicate offense such as DUI).  The letter added that Appellee had the right to file a timely appeal.  *See id.* §1550(a).

Appellee exercised that right and filed an appeal in the Delaware County Court, challenging the suspension's validity due to the delay involved.  The court held a hearing at which Appellee's driving record was entered into evidence, and Appellee was the sole witness.  His testimony centered largely on changes in his life between 2014, when his license would have been suspended but for the Office of Judicial Support's delay in reporting the conviction to PennDOT, and 2016.

Specifically, Appellee testified that:  in 2014 he was employed as an information-technology professional and lived with his wife; his car was "totaled" the day he was arrested for DUI, and he waited to buy a new one because he was expecting his driving privileges to be suspended; when it appeared that might not occur, he bought a new car; at the time, he could afford such a purchase because he was employed; had his privileges been suspended in a timely manner, he could have relied on his wife to drive him to appointments in her car; now, however, he is divorced, unemployed, and lives

---

[1] Appellee's conviction was based on a negotiated guilty plea.

alone; he is 61 years old and classified for Social Security purposes as totally disabled due to a neurological disorder; his condition has worsened since the time of his conviction; his treatment requires regular visits to five doctors; his only income is a monthly Social Security disability payment of $1,621; he needs to drive to attend doctor's appointments and purchase medicine and groceries, because there is no friend or relative available to help with these tasks; he cannot afford to hire a ride for such purposes because his disability income – which is approximately one third of his income when he was employed – would be insufficient for that expense; moreover, his spending already exceeds his income by about $250 per month. Additionally, Appellee explained that he was expecting his license to be suspended shortly after he pled guilty and did not know the reason for the delay. *See* N.T., Jan. 24, 2017, at 5-24.

The trial court credited Appellee's testimony and ultimately ruled in his favor. In reaching its holding, the court relied on *Gingrich v. PennDOT*, 134 A.3d 528 (Pa. Cmwlth. 2016), which set forth the following rule for situations where the delay is attributable to a court clerk rather than PennDOT:

> [W]here . . . a licensee is able to demonstrate all of the following: [(1)] a conviction that is not reported for an extraordinarily extended period of time; [(2)] the licensee has [no further violations of the Vehicle Code] for an extended period; and [(3)] prejudice, it may be appropriate for common pleas to grant relief.

*Id*. at 535. Applying the standard, the trial court found that the 28-month delay was extraordinary, Appellee did not have any further violations during that period, and Appellee had demonstrated he would be prejudiced by the lateness of the suspension, particularly in view of his medical condition and the impact a suspension would have on it. *See PennDOT v. Middaugh*, No. 2016-8188, Findings of Fact and Conclusions of Law, at 5, ¶¶30-33 (C.P. Del. May 19, 2017).

A divided Commonwealth Court panel affirmed in a published decision. *See Middaugh v. PennDOT*, 196 A.3d 1073 (Pa. Cmwlth. 2018) (*en banc*). The majority initially noted that, where PennDOT is at fault, license suspensions have been judicially set aside where the delay was so protracted that it led the driver to believe no suspension was forthcoming, and the driver relied on that belief to his or her detriment. *See id*. at 1080-81 (quoting, *inter alia*, *PennDOT v. Green*, 119 Pa. Cmwlth. 281, 284, 546 A.2d 767, 769 (1988), *aff'd per curiam*, 524 Pa. 98, 569 A.2d 350 (1990)); *accord Terraciano v. PennDOT*, 562 Pa. 60, 66, 753 A.2d 233, 236 (2000) (citing *Fischer v. PennDOT*, 682 A.2d 1353, 1355 (Pa. Cmwlth. 1996)). The majority observed, however, that when the clerk's office of one of Pennsylvania's sixty judicial districts is responsible for the delay, courts have traditionally been reluctant to provide such relief so as to prevent erosion of the roadway-safety rationale underlying the license suspensions. *See Middaugh*, 196 A.3d at 1081-82 (discussing cases); *accord Pokoy v. PennDOT*, 714 A.2d 1162, 1164 (Pa. Cmwlth. 1998) (indicating that only delays attributable to PennDOT can form the basis for relief). *See generally infra* note 4.

Nevertheless, the majority explained, the advent of electronic reporting has improved the ease with which clerks can transmit notices to PennDOT and detect reporting delays. Thus, the majority continued, it has become more reasonable for reviewing courts to scrutinize lengthy intervals occasioned by a court clerk's failure to notify PennDOT of a predicate conviction within a reasonable time. The majority expressed that this line of reasoning ultimately led to the *Gingrich* decision and its articulation of the above-quoted three-factor test for delays which are not attributable to PennDOT. *See Middaugh*, 196 A.3d at 1082 (discussing *Gingrich*).[2]

---

[2] In *Gingrich*, relief was granted where the court clerk waited ten years to report the conviction to PennDOT, and, in the interim, the driver had changed her position to her
(continued…)

The majority clarified that, under *Gingrich*, relief based on a judicial clerk's delay is reserved for "extraordinary circumstances where 'the suspension loses its public protection rationale and simply becomes an additional punitive measure resulting from the conviction, but imposed long after the fact.'" *Id.* at 1083 (quoting *Gingrich*, 134 A.3d at 534). Thus, the court stated that *Gingrich*, in effect, applied a rationale based on due process and fairness, pursuant to which PennDOT may not suspend privileges where doing so would no longer meaningfully protect the public and would become additional punishment resulting from the conviction. *See id.* (quoting *Gingrich*, 134 A.3d at 534). It specified, though, that a court clerk's reporting delay can only be deemed "extraordinary" if it exceeds the suspension period (here, twelve months) plus the ten-day window statutorily prescribed for notification to PennDOT. *See id.* at 1086.[3]

Applying *Gingrich* to the present facts, the majority pointed out that, as the 28-month delay exceeded the suspension period plus ten days, the trial court was permitted to view it as extraordinary. It also agreed summarily with the trial court's conclusion that Appellee's suspension "is not in the interest of protecting the public, but

_____

(…continued)
detriment based on her belief that her license would not be suspended. *See Gingrich*, 134 A.3d at 534-35. The circumstances involved in *Gingrich* are discussed below.

[3] This lower limit of ten days plus the suspension period does not appear in *Gingrich*. It was added to the *Gingrich* test by the panel in the present matter to serve "the need for consistency and certainty in *Gingrich*'s application," *id.* at 1086 n.17, and to balance objectives relating to public safety with drivers' due process rights. *See id.* at 1086-87.

In deciding that the sum of the two statutory periods constitutes the lower bound for a determination of extraordinariness, the panel referred to the trial court's explanation that drivers should not have to "put [their lives] on hold" indefinitely waiting for a notice of suspension that may arrive years later than contemplated by statute. *PennDOT v. Middaugh*, No. 2016-8188, Opinion, at 10 (C.P. Del. June 21, 2017). The panel expressed that it would not be extraordinary for drivers to have to put their lives on hold during the anticipated period of suspension. *See Middaugh*, 196 A.3d at 1085-86.

rather will be an additional punishment to be imposed years later." *Id.* at 1087 (quoting *PennDOT v. Middaugh*, No. 2016-8188, Opinion, at 11 (C.P. Del. June 21, 2017)).

Judge Covey filed a concurring and dissenting opinion, agreeing that Appellee was entitled to relief, but disagreeing with the formula fashioned by the majority for the smallest delay that can be deemed extraordinary. She opined, as well, that the *Gingrich* test should be abandoned. In her view, because prejudice is inherent to the suspension of driving privileges, it should not be a factor that can give rise to relief. She concluded that a flexible standard aimed at assessing the threat to public safety in each individual case should be used – for example, by giving substantial weight to whether the driver accrued additional Vehicle Code violations after the conviction which triggered the license suspension. *See Middaugh*, 196 A.3d at 1087-88.

Judge Ceisler dissented, suggesting that *Gingrich* should be overruled and the court should return to the pre-*Gingrich* rule exemplified by *Pokoy*, where only delays attributable to PennDOT can potentially form the basis for relief.[4] In her view, drivers

---

[4] In *Green*, the intermediate court explained the rationale for this rule as follows:

> Under the Vehicle Code, [PennDOT] is the agency made responsible for imposition of the sanctions which the law uses to keep unsafe drivers off the highways for stated periods. This court has held that a material breach by [PennDOT] of that responsibility will invalidate the legal effectiveness of the sanction. If [PennDOT] too often failed to meet the responsibility thus focused upon it, the locus of fault would be clear and executive and legislative remedies could be directed at [PennDOT]. But a very different situation would prevail if the effectiveness of the Vehicle Code sanctions became dependent upon scores of court clerks and hundreds of functionaries within the minor judiciary. This court's rule therefore protects the vehicle safety laws from vulnerability to delays within a system where detection and correction of official failure would be much more difficult.

*Green*, 119 Pa. Cmwlth at 284, 546 A.2d at 769.

who are uncertain about the status of a pending suspension can seek information from PennDOT, and unsafe drivers should not receive a windfall simply because a county court's clerical staff failed to comply with its statutory obligations in a timely manner. *See id.* at 1088-90.

This Court granted allocatur to decide the following issue framed by PennDOT:

> Did the Commonwealth Court err as a matter of law and abuse its discretion in affirming the trial court's order rescinding an operating privilege suspension that was imposed less than three years after [Middaugh]'s driving under the influence (DUI) conviction, where the delay was entirely due to the failure of the Delaware County Office of Judicial Support to timely notify the Department of Transportation of the conviction?

*Middaugh v. PennDOT*, ___ Pa. ___, ___, 208 A.3d 460, 461 (2019) (*per curiam*).

## II.

When reviewing a trial court's ruling in a license-suspension appeal, we evaluate whether its findings of fact are supported by competent evidence and whether it committed an error of law or abused its discretion. *See Terraciano*, 562 Pa. at 65-66, 753 A.2d at 236. Here, the findings largely tracked Appellee's testimony which, as noted, was expressly credited by the trial court. Beyond this, the court applied precepts set forth in the Commonwealth Court's *Gingrich* decision. Whether that action was proper largely depends on the viability of the *Gingrich* standard. This, in turn, raises an issue of law as to which our review is plenary and *de novo*. *See PennDOT v. Weaver*, 590 Pa. 188, 191, 912 A.2d 259, 261 (2006).

In arguing that the Commonwealth Court's order should be reversed, PennDOT refers to this Court's decisions in *Terraciano* and *PennDOT v. Gombocz*, 589 Pa. 404, 909 A.2d 798 (2006). Those cases involved license suspensions which, like the one in this case, were delayed for years. However, the delays in those matters occurred in the

midst of litigation ensuing from the driver's decision to appeal the license suspension, and were not based on belated notification from PennDOT. The decisions employed a straightforward rule: when the litigation delay is attributable to the driver's inaction, the suspension will be upheld; but when the litigation delay is chargeable to PennDOT, the suspension will be set aside so long as the driver is able to demonstrate two elements: that the delay led the driver to believe no suspension would ultimately issue, and that the driver would be prejudiced by it.[5]

Presently, PennDOT highlights that it lacks statutory authorization to suspend a driver's license until it receives a certified record from the court system. It suggests that, since it cannot be held responsible for such a delay, it should not be judicially restrained from suspending a driver's privileges under those circumstances. PennDOT points out that this principle was expressly recognized in *Terraciano*, which stated that "judicial delay may not be attributable to PennDOT when determining whether there was an unreasonable delay," *Terraciano*, 562 Pa. at 67 n.9, 753 A.2d at 237 n.9 (citing *Walsh v. PennDOT*, 137 Pa. Cmwlth. 549, 553, 586 A.2d 1034, 1036-37 (1991)), and that it was reaffirmed in *Gombocz*, which applied the same rule in holding that PennDOT was permitted to suspend the driver's privileges. *See Gombocz*, 589 Pa. at 409-10, 909 A.2d at 802 (2006). *See* Brief for PennDOT at 11-12.

The statement in *Terraciano* did acknowledge the governing rule in the Commonwealth Court in this regard. However, the case concerned litigation delay, not

---

[5] A fair reading the cases suggests that the prejudice involved would have to exceed that ordinarily associated with suspended driving privileges, as it would have to stem from the delay itself. Thus, for example, during the seven-year period between her conviction and her license suspension, Ms. Terraciano obtained a commercial driving license from PennDOT and became employed as a bus driver. Because she would have lost her job if her license had been belatedly suspended, she was found to have demonstrated prejudice. *See Terraciano*, 562 Pa. at 68-69, 753 A.2d at 237.

a delayed initial notice of suspension to the driver. *Gombocz* likewise involved litigation delay, the only difference being that the driver rather than PennDOT had the burden to move the case forward in the common pleas court. This latter situation differs materially from the present one in that the driver always maintained the ability to advance the proceedings toward a final judicial resolution of whether his license would be suspended; it was *his* inaction which resulted in the delay, not that of any governmental entity. In both *Terraciano* and *Gombocz*, then, the threshold question was whether the driver or the government was at fault for the delay.

This Court has never decided a case involving an unreasonably-delayed *initial* PennDOT suspension notice to a driver, nor has it undertaken to resolve whether an extraordinary license-suspension delay arising from a belated report from a court clerk to PennDOT should be treated differently from a situation where PennDOT fails to take timely action in response to a timely report. This latter question is fairly subsumed within the issue framed by PennDOT (quoted above), which emphasizes that the long delay here was attributable to the Office of Judicial Support – again, the equivalent of a common pleas court clerk's office – rather than to PennDOT.

**III.**

Initially, we note that the statutory scheme presently in issue is mandatory in that it does not leave room for administrative discretion in deciding whether to suspend a driver's operating privileges. In this respect, the General Assembly clarified that certain predicate offenses such as DUI must be reported to PennDOT:

> The clerk of any court of this Commonwealth, within ten days after final judgment of conviction or acquittal or other disposition of charges under any of the provisions of this title or under section 13 of the [Controlled Substance, Drug, Device and Cosmetic Act], including an adjudication of delinquency or the granting of a consent decree, *shall* send to [PennDOT] a record of the judgment of conviction, acquittal or other disposition.

75 Pa.C.S. §3804(e)(1) (emphasis added). PennDOT is then required to suspend privileges: when a driver is convicted of DUI, upon receiving the report PennDOT "shall suspend the [driver's] operating privileges" for the specified period of time. *Id.*

This mandatory feature of the system is consistent with the underlying policy objective of enhancing public safety by removing dangerous drivers from the roadways for a defined period of time after a predicate violation. The inconvenience and disruption stemming from a license suspension serves the same purpose by deterring drivers from repeating their dangerous conduct after privileges are restored. *Accord People v. Schaefer*, 609 N.E.2d 329, 331 (Ill. 1993) ("The Illinois legislature has determined that drivers impaired by alcohol or drugs pose a threat to public safety and welfare, and that the suspension of driving privileges represents an appropriate means to deter and remove these problem drivers from the highway." (internal quotation marks and citation omitted)).

The fact that the clerk of the common pleas court is given only ten days to report the violation reflects a clear legislative intent that suspensions should occur soon after the conviction. Unfortunately, though, the General Assembly did not specify what should occur vis-à-vis the driver's operating privileges when the report is sent beyond the ten-day period. We believe it would be inconsistent with legislative intent to read the statute to suggest that such a report cannot be acted upon by PennDOT. A holding along those lines would allow license suspensions to be thwarted due to administrative failures, including minor ones such as the sending of the report one day late. Notably, even Appellee does not suggest such a result would have been intended by the Legislature. *Cf. Samdahl v. Dep't of Transp. Dir.*, 518 N.W.2d 714, 717 (N.D. 1994) (suggesting "an absurd result" would follow if an intoxicated driver's privileges could not be suspended solely because the notice of such suspension was provided beyond the

statutory period). Given the importance of roadway safety to the traveling public, if this is indeed the General Assembly's intent, it will need to so state in more explicit terms.

In light of the above, we read the relevant statutory provisions as requiring license suspensions notwithstanding administrative lapses. This leaves open multiple questions: whether there is any avenue of relief for a driver who receives, after an unreasonable delay, notice that his or her operating privileges are being suspended; if so, whether the availability of such relief depends on which government entity is responsible for the delay – PennDOT or the common pleas court; and whether the driver must demonstrate any additional factors beyond the delay to obtain relief.

## A. Due process

As to the first question, although we have concluded that there is no statutory basis for relief, restrictions imposed by the Constitution can limit whether otherwise-valid legislation may be applied in specific circumstances. *See Ladd v. Real Estate Comm'n*, ___ Pa. ___, ___, 230 A.3d 1096, 1111 (2020). *See generally Commonwealth ex rel. Corbett v. Griffin*, 596 Pa. 549, 560, 946 A.2d 668, 675 (2008) (explaining that the General Assembly establishes public policy "which this Court enforces subject to constitutional limitations" (citing *Program Admin. Servs., Inc. v. Dauphin Cty. Gen. Auth.*, 593 Pa. 184, 192, 928 A.2d 1013, 1017-18 (2007))). Beginning with *Gingrich* and continuing with the present case, the Commonwealth Court has begun to refer to due process as the basis on which a license-suspension appeal may be sustained in an extraordinary-delay scenario where the delay is not chargeable to PennDOT.[6] In

---

[6] Prior to *Gingrich*, in *Smires v. O'Shell*, 126 A.3d 383 (Pa. Cmwlth. 2015), a group of licensees filed a mandamus petition directed to the Commonwealth Court's original jurisdiction, and alleged that their rights under, *inter alia*, the Due Process Clause, were violated when the clerk of courts reported their convictions to PennDOT five-to-ten years late. The court dismissed the petition, holding that the drivers should instead (continued…)

*Gingrich*, the court did not expressly state it was relying on due process. However, it noted that the common pleas court considered the ten-year delay to have given rise to a "patent denial of due process," *Gingrich*, 134 A.3d at 530, and it ultimately rested its decision on the view that a suspension that stale would "los[e] the underlying public safety purpose and now simply [be] a punitive measure . . . imposed too long after the fact." *Id.* at 535; *accord Middaugh*, 196 A.3d at 1083 (characterizing *Gingrich*'s holding as being grounded on an "implicit . . . due process consideration"). As such, the court's reasoning implicated a rational-basis inquiry. The *Middaugh* decision made the due process rationale express. *See Middaugh*, 196 A.3d at 1087 (indicating that the standard developed in *Gingrich* and applied in the present case sought to balance the legislative goal of removing unsafe drivers from the roads with the constitutional mandate to afford due process in the context of an extraordinary delay). *Accord* Brief for Appellee at 2 (arguing that "due process considerations are applicable in driver license suspension cases").

The United States Supreme Court endorsed this type of means-ends assessment for purposes of the Fourteenth Amendment's Due Process Clause in *Nebbia v. New York*, 291 U.S. 502, 54 S. Ct. 505 (1934).[7] The Court explained that state laws may not be "unreasonable, arbitrary, or capricious," and that "the means selected [to achieve a valid governmental objective] shall have a real and substantial relation to the object sought to be attained." *Id.* at 525, 54 S. Ct. at 511. In more recent years, this Court has viewed such concepts as also pertaining within the Pennsylvania

---

(…continued)
have filed statutory appeals. *See id.* at 394. Hence, in that matter the court did not reach the merits of the drivers' due process contention.

[7] That provision indicates that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, §1.

Constitution's due process guarantee, which in turn has been identified as stemming from Article I, Section 1.[8] *See, e.g.*, *Nixon v. Commonwealth*, 576 Pa. 385, 404, 839 A.2d 277, 290 (2003); *Gambone v. Commonwealth*, 375 Pa. 547, 551, 101 A.2d 634, 637 (1954). This is, in essence, the rational-basis standard prevailing under the rubric of substantive due process. *See Shoul v. PennDOT*, 643 Pa. 302, 320, 173 A.3d 669, 679-80 (2017); *see also id.* at 314-17, 173 A.3d at 676-78 (reviewing substantive due process precepts as applied by this Court). *But see id.* at 333-43, 173 A.3d at 688-94 (Wecht, J., concurring) (offering a developed critique of the continued use of substantive due process to invalidate legislative provisions).[9]

In outlier situations – that is, situations that depart substantially from the ordinary and expected application of a law – due process norms can be invoked to restrain enforcement of a law under the circumstances where it appears that the targeting of the particular person or entity in question will do little to achieve the evident legislative objective. In *Ladd*, for example, this Court preliminarily enjoined the application of a law regulating real-estate brokerage businesses to a person whose activities were limited to managing several short-term vacation rental properties. The *Ladd* Court noted that the individual's claim sounded in substantive due process. As explained, under that standard the right infringed by the law is weighed against the interest sought to be

---

[8] *See* PA. CONST. art. I, §1 ("All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.").

[9] The rational-basis inquiry under the state Constitution is implicated for rights which are not considered fundamental, and it is more exacting than the rational-basis test under the federal Constitution. *See Ladd*, ___ Pa. at ___ & n.14, 230 A.3d at 1108 & n.14. Where fundamental rights are impacted, courts apply strict scrutiny. *See D.P. v. G.J.P.*, 636 Pa. 574, 585, 146 A.3d 204, 210 (2016).

achieved by its application. *See Ladd*, ___ Pa. at ___, 230 A.3d at 1108; *see also Bucks Cty. Servs., Inc. v. Phila. Parking Auth.*, 649 Pa. 96, 116-17, 195 A.3d 218, 231 (2018) (stating that, in addition to asking whether a challenged statute seeks to achieve a valid state objective by means rationally related to it, "a substantive due process analysis requires courts to balance the rights of the individuals subject to the regulation against the public interest" (citation omitted)). This Court ultimately concluded that Ms. Ladd's claim raised a colorable argument that the law's requirements were unconstitutional as applied to her because, in her specific context, its application would be "unreasonable, unduly oppressive, and patently beyond the necessities of the case, thus outweighing the government's legitimate policy objective." *Ladd*, ___ Pa. at ___, 230 A.3d at 1111 (citing *Gambone*, 375 Pa. at 551, 101 A.2d at 637).[10]

Relatedly, due process incorporates the concept that the government must treat individuals with basic fairness. *See, e.g.*, *N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Family Trust*, ___ U.S. ___, ___, 139 S. Ct. 2213, 2219 (2019) (explaining the Fourteenth Amendment's Due Process Clause is centrally concerned with the fundamental fairness of governmental activity); *Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S. Ct. 1990, 1994 (1987) (referring to "the fundamental fairness mandated by the Due Process Clause"); *Rogers v. Tennessee*, 532 U.S. 451, 462, 121

---

[10] This Court has referred to substantive due process in other situations where the government's delay in the particular case, rather than the facial validity of a statute, was alleged to have violated individual rights. *See State Dental Council v. Pollock*, 457 Pa. 264, 274, 318 A.2d 910, 916 (1974) (recognizing that an unreasonable delay in the suspension of a dental license, combined with demonstrable harm from the delay, can deny the practitioner due process); *Commonwealth v. West*, 595 Pa. 483, 492, 938 A.2d 1034, 1040 (2007) (observing that Pennsylvania courts have applied a test derived from *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972), when determining whether lengthy delays in criminal cases, such as pre-trial delays or sentencing delays, amount to due process violations).

S. Ct. 1693, 1700 (2001). Like the requirement of a means-end correspondence, this fairness mandate is a facet of "substantive" due process. *See Perry v. New Hampshire*, 565 U.S. 228, 249, 132 S. Ct. 716, 730 (2012) (Thomas, J., concurring) (citing cases). *See generally* Timothy Sandefur, *In Defense of Substantive Due Process, or the Promise of Lawful Rule*, 35 HARV. J. LAW & PUB. POL'Y 283, 307 (arguing that the "of law" portion of the phrase "due process of law" was historically understood to encompass a requirement that laws and their implementation must "accord basic fairness and equality" to all individuals).

We find that appeals of license suspensions based on the staleness of the underlying conviction bear some parallels to litigation in which other recognized, but non-fundamental, rights are at stake – such as the right to engage in lawful employment at issue in *Ladd*: as in *Ladd*, such appeals involve as-applied challenges to presumptively valid statutory provisions; the regulation under review affects the continued possession of an important, constitutionally-protected interest;[11] and where the suspension is delayed for an extraordinary period of time, the staleness of the predicate conviction tends to diminish the connection between the suspension and the statute's objectives, particularly where there have been no Vehicle Code violations in the interim. *See generally Sec'y of Revenue v. John's Vending Corp.*, 453 Pa. 488, 493, 309 A.2d 358, 361-62 (1973) (observing that remote convictions have little value in assessing a person's present character or likely future conduct). Separately, it would be

---

[11] *See Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586, 1589 (1971) (noting that the ability to drive an automobile constitutes a protected interest whether the state refers to it as a right or a privilege); *see also id.* (recognizing that the continued possession of driving privileges may be essential to the pursuit of one's livelihood); *accord Bragg v. Dir., Div. of Motor Vehicles*, 690 A.2d 571, 573 (N.H. 1997); *People v. Fisher*, 705 N.E.2d 67, 77 (Ill. 1998) (observing that "drivers have a strong interest in the continued possession of their drivers' licenses").

difficult to contend that fundamental-fairness concerns can never be implicated regardless of how long the government waits to suspend a licensee's privileges in a particular case.[12]

In light of the foregoing, we ultimately agree with the *Gingrich/Middaugh* line of Commonwealth Court decisions to the extent it suggests that a license suspension which is unreasonably delayed through no fault of the driver's can potentially result in a denial of due process.

## B. Government entity at fault

We now turn to second question mentioned above: whether the availability of relief can be made to depend on which governmental entity – PennDOT or the clerk of the common pleas court – is at fault for the delay. With regard to the Commonwealth Court's decisions in which that distinction was made, such as *Green* and *Pokoy*, *see supra* note 4, Appellee argues those cases

> can be considered somewhat counter-intuitive in that, from the perspective of the motorist who has been prejudiced by a delay, it makes little difference which government entity . . . is responsible for it. Indeed, in suffering through an untimely suspension following a change in personal

---

[12] Other states have also found that due process may be violated where a licensee's driving privileges are suspended after an unreasonable delay. *See, e.g.*, *Hipp v. Dep't of Motor Vehicles*, 673 S.E.2d 416 (S.C. 2009); *Miller v. Moredock*, 726 S.E.2d 34 (W. Va. 2011). In *Hipp*, the South Carolina court determined that allowing a suspension twelve years after the predicate conviction would violate due process by denying the driver fundamental fairness. *See Hipp*, 673 S.E.2d at 417. And in *Miller*, the West Virginia court held that a 17-month delay could give rise to a due process violation if prejudice were to be demonstrated on remand. *See Miller*, 726 S.E.2d at 41. In both matters, like here, the delay was not the fault of either the driver or the state department of motor vehicles. *But cf. Alvarez v. Div. of Motor Vehicles*, 249 P.3d 286 (Alaska 2011) (finding that a two-and-a-half year delay did not violate procedural due process as required by *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1976)).

circumstances, a motorist such as [Appellee] is not likely to even know or care about the actual source of his or her predicament.

Brief for Appellee at 3-4. Thus, Appellee maintains that the intermediate court's decisions in *Gingrich* and the present controversy appropriately recognized that, where a delay is so long as to result in prejudice, the driver is entitled to relief although PennDOT is not at fault. *See id.* at 5.

For its part, PennDOT criticizes the *Gingrich* court for having departed from the Commonwealth Court's previous rule that a suspension may only be invalidated where PennDOT is at fault for the delay. Somewhat inconsistently, PennDOT also notes it elected not to challenge the decision at the time because the delay involved was "too lengthy, regardless of who was at fault[.]" Brief for PennDOT at 14. In all events, PennDOT seeks to distinguish *Gingrich* on the basis that the delay involved in the present dispute was shorter than the amount of time Ms. Gingrich waited to receive her suspension notice. In making this distinction, PennDOT additionally takes issue with the *Middaugh* court's bright-line rule that any delay less than or equal to the sum of the suspension period plus the ten-day reporting period is reasonable as a matter of law. *See id.* at 15.[13]

To the extent a delayed notice of suspension is alleged to violate the driver's due process rights, nothing in the above analysis, or in the parties' advocacy, suggests that such allegation may only have merit where the delay is chargeable to PennDOT rather

---

[13] PennDOT appears to misapprehend the rule as stating that a delay greater than that period of time is *per se* unreasonable. *See id.* at 16 ("[N]owhere in its *Middaugh* decision does the Commonwealth Court explain why a delay of one year and ten days is permissible, but a delay of one year and eleven days is not.").

As for PennDOT's efforts to distinguish *Gingrich*, we note that they are unnecessary. Neither PennDOT nor this Court has previously endorsed the holding in *Gingrich*, and PennDOT was not under any obligation to seek further review in that matter on pain of waiving its subsequent ability to argue that *Gingrich* was wrongly decided.

than some other facet of the government. The focus here is on whether relief is due based on an alleged violation of the driver's rights; and as Appellee correctly observes, as far as the driver is concerned the mechanism by which inter-agency communication takes place – ultimately resulting in a notice of suspension – is internal to the government and of little relevance to those rights, so long as the driver is not at fault for the delay. It follows that the locus of a breakdown in that mechanism is also immaterial to an evaluation of whether the driver's rights have been impacted.

Accordingly, we conclude that a claim that a license suspension imposed after an unreasonable delay violates the driver's due process rights stands on the same footing regardless of whether the delay is chargeable to PennDOT or the clerk of the common pleas court.

## C. Interim driving record

With that said, in view of the important governmental interests advanced by the statutory license-suspension provisions, in assessing whether relief is due courts should take into account the driver's violations (if any) during the course of the delay. If it appears the driver remains a danger to the public, it will be difficult to argue that the suspension fails to satisfy the means-end requirement – *i.e.*, that due process is offended on the basis that there is little connection between a suspension of privileges and the legislative goal of protecting the public. For present purposes, we need not set forth a *per se* rule that *any* moving violation is fatal to a due process claim regardless of its nature, age, or severity – as here it is undisputed that Appellee had no further violations, and hence, this factor does not detract from his entitlement to relief under a due process theory. We note, however, that the severity of the predicate offense, and the severity and age any further violations, are relevant to the inquiry.

## D. Prejudice

We also agree with Commonwealth Court and extra-jurisdictional decisions which have imposed a requirement that the driver demonstrate he or she suffered prejudice from the delay. *See Rea v. PennDOT*, 132 Pa. Cmwlth. 145, 150-51, 572 A.2d 236, 238 (1990); *Miller*, 726 S.E.2d at 39, 40 (stating that actual prejudice from the delay must be demonstrated and then balanced against the reasons for the delay); *In re Garber*, 357 A.2d 297, 299 (N.J. Super. Ct. App. Div. 1976) (holding that prejudice must be proved as a prerequisite to relief from a delayed suspension); *cf. Dubbelde v. Dep't of Transp.*, 324 P.3d 820, 826 (Wyo. 2014) (indicating that a driver could not establish a violation of procedural due process without demonstrating prejudice from a one-year administrative delay, as there was no reason to believe a different outcome would have been reached absent the delay). Of particular salience is the Iowa Supreme Court's explanation that the "mere passage of time in and of itself" does not violate the driver's substantive rights. *McFee v. Dep't of Transp.*, 400 N.W.2d 578, 581 (Iowa 1987). The court continued that, to hold that a long delay alone is grounds for relief "would promote the dangerous driver's rights over those of the general public and would frustrate the legislature's strongly established goal of removing dangerous drivers from the highways." *Id.*

This precept, however, is subject to a limiting principle whereby an extreme delay such as ten or twelve years may be viewed as *per se* prejudicial. Thus, the South Carolina Supreme Court in *Hipp* determined that allowing a suspension twelve years after the underlying conviction would in itself violate due process by denying the driver fundamental fairness. *See Hipp*, 673 S.E.2d at 417. Finally, the prejudice must be occasioned by the delay and not by the suspension alone – which, while perhaps prejudicial in itself, is an ordinary part of the governing statutory framework. *See*

*generally Reitz v. Mealey*, 314 U.S. 33, 36, 62 S. Ct. 24, 26-27 (1941) (recognizing that states are permitted to enforce licensing regulations aimed at promoting public safety), *overruled on other grounds by Perez v. Campbell*, 402 U.S. 637, 651-52, 91 S. Ct. 1704, 1712 (1971).[14]

## IV.

Applying the above precepts, we believe that upon a showing of prejudice, the approximately 28-month delay in this case can appropriately be viewed as denying Appellee his due process rights. Although this is not as long as the delays that have occurred in some of the other matters discussed above, it seems to us objectively unreasonable for a driver to have to wait nearly two and a half years for administrative action that is expected to occur within approximately two months – and would occur during that timeframe where the governmental entities involved are functioning competently, as citizens have a right to expect them to do.

The question becomes, then, whether Appellee demonstrated prejudice in the common pleas court. As detailed above, his credited testimony established that he was expecting his license to be suspended within the ordinary timeframe and, as such, he postponed purchasing a vehicle to replace the one which had been "totaled" in an accident. Further, had his privileges been suspended in a timely manner, his wife could have helped him travel to and from doctor's appointments. By the time his suspension notice arrived, however, he was divorced, his income was insufficient to pay for rides,

---

[14] We recognize that *Terraciano* spoke in terms of affording "equitable relief" where an unreasonable delay caused a licensee to believe that her operating privileges would not be suspended. *Terraciano*, 562 Pa at 66, 753 A.2d at 237. However, we find the Commonwealth Court's present invocation of due process and fundamental fairness to be more apt for the reasons given.

and no friend or relative was available to provide transportation.  Further, his medical condition had worsened and he was now treating with multiple doctors.

Under these facts, we conclude that the trial court's finding – that Appellee would suffer prejudice if the suspension were to be imposed at this juncture – is supported by competent evidence of record, and moreover, it demonstrates that prejudice would follow from the fact of the delay itself.  Additionally, there is no dispute that Appellee did not accrue any additional Vehicle Code violations after his predicate DUI conviction. We therefore agree with the Commonwealth Court majority that a suspension at this late date will have lost much of its effectiveness with regard to its underlying legislative purposes, result in prejudice which can be attributed to the delay, and ultimately deny fundamental fairness.

## V.

Accordingly, the order of the Commonwealth Court is affirmed.


Justices Baer, Donohue and Dougherty join the opinion.

Justice Wecht files a concurring and dissenting opinion in which Justice Todd joins.

Justice Mundy files a dissenting opinion.