[J-7-2020] [MO: Saylor, C.J.]

**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING, | : | No. 45 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 815 CD |
| Appellant | : | 2017 dated October 31, 2018 |
| | : | Affirming the Order of the Delaware |
| | : | County Court of Common Pleas, |
| v. | : | Civil Division, at No. 2016-008188 |
| | : | dated May 19, 2017, exited May 22, |
| | : | 2017. |
| STEPHEN MIDDAUGH, | : | |
| | : | ARGUED: March 10, 2020 |
| Appellee | : | |

## CONCURRING AND DISSENTING OPINION

**JUSTICE WECHT**                                                  **DECIDED: January 20, 2021**

I agree with the learned Majority that Stephen Middaugh's driving privileges should

be restored, but for entirely different reasons. Because the Vehicle Code[1] applies no time

limit to PennDOT's obligation and authority to suspend a driver's license upon receipt of

a judicial report of a qualifying conviction, we must look outside the Code to find a remedy

for extreme unexcused delay. Thus in *Terraciano v. PennDOT*,[2] this Court correctly held

that PennDOT's inexcusable failure for years to advance litigation concerning a driver's

mandatory suspension caused prejudice to the subject driver that required relief.

---

[1]     *See* Act of June 17, 1976, P.L. 162, No. 81, *codified as amended*, 75 Pa.C.S. §§ 101, *et seq.*

[2]     753 A.2d 233 (Pa. 2000); *see* Maj. Op. at 7-9.

However, PennDOT is not at fault for the delay that engendered this case. Instead, we confront delay occasioned by the Delaware County Court of Common Pleas' Office of Judicial Support,[3] upon whom the Vehicle Code imposes an unequivocal ten-day time limit with no analog in the Code's provisions setting forth PennDOT's obligations. In holding that judicial delay must be treated identically to PennDOT delay as a matter of substantive due process, the Majority effectively obviates the statutory time limit imposed upon clerks to fulfill their reporting obligation and unnecessarily constitutionalizes the inquiry. Under these circumstances, I disagree with the Majority's reliance upon due process principles to address judicial delay. Nonetheless, I concur in the Majority's mandate because my application of the statute according to its terms would lead to the same outcome for Appellee Stephen Middaugh.

This case requires us to interpret the Vehicle Code. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions."[4] Thus, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."[5] Moreover, "when faced with an issue raising both constitutional and non-constitutional questions, we

---

[3]     The Office of Judicial Support is that court's equivalent of the clerk of court in other jurisdictions. To harmonize my discussion with the relevant statutory language, hereinafter I refer to clerks and clerks of court.

[4]     1 Pa.C.S. § 1921(a).

[5]     *Id.* § 1921(b).

will make a determination on non-constitutional grounds, and avoid the constitutional question if possible."[6]

Subsection 6323(1)(i) of the Vehicle Code provides in relevant part: "The clerk of any court of this Commonwealth, *within ten days* after final judgment of conviction or acquittal or other disposition of charges under any of the provisions of this title . . ., *shall send* to [PennDOT] a record of the judgment of conviction, acquittal or other disposition."[7] The Vehicle Code further provides that PennDOT "*shall* suspend the operating privilege of an individual . . . upon receiving a certified record of the individual's conviction."[8] Thus, the clerk's transmittal is necessary to effectuate the mandatory license suspension required for a conviction of, *inter alia*, driving under the influence ("DUI"), the predicate violation at issue in this case.[9]

Incongruously, both clerks of courts and PennDOT have nominally mandatory obligations, but only clerks face a statutory time limit within which to perform their duty. More incongruously still, for decades the Commonwealth court recognized a remedy *only* for egregious delay by PennDOT, the agency upon which the Code imposes *no* specific time limit by which to measure compliance.[10] But judicial delay, despite being subject to an express (and reasonable, if stringent) statutory time limit and causing an

---

[6]      *In re "B,"* 394 A.2d 419, 421-22 (Pa. 1978).

[7]      75 Pa.C.S. § 6323(1)(i)(emphasis added).

[8]      *Id.* § 3804(e)(1)(emphasis added).

[9]      *See Id.* § 3804(e)(1)(i).

[10]      *See* Maj. Op. at 4 (citing *inter alia PennDOT v. Green*, 546 A.2d 767 (Pa. Cmwlth. 1988); *Pokoy v. PennDOT*, 714 A.2d 1162 (Pa. Cmwlth. 1998)); *see also Gingrich v. PennDOT*, 134 A.3d 528, 531-34 (Pa. Cmwlth. 2016) (*en banc*) (reviewing at length the relevant line of cases establishing disparate treatment).

indistinguishable injury to the licensee, was deemed irremediable. Among the court's rationalizations for the disparate treatment was that the legislature intended the express time limit imposed upon clerks of court to be read as directory rather than mandatory.[11]

More recently, in *Gingrich* and in this case, the Commonwealth Court has shifted its treatment of drivers whose suspensions are delayed due to judicial, rather than Department, inaction to more closely resemble how it long has assessed delayed enforcement by PennDOT. The principal means by which the lower court has equated PennDOT and judicial delay is by reference to the court's collective views on "sound policy," rather than its treatment of the ten-day mandate as mandatory.[12] In effect, the court has found that PennDOT's obligation to impose the suspension is mandatory simply because it does *not* furnish a time limit, and thus leaves room for courts in their discretion to rectify egregious delay, but the express time limit imposed upon clerks of courts for fulfilling their duty is merely "directory" because to apply it strictly would *eliminate* court discretion to square the statute with judicial assessments of public policy. Heads discretion wins, tails the statute loses. But as we often reiterate, courts should not defy statutory language in the interests of whatever policy strikes them as sound.[13] The

---

[11] *Gingrich*, 134 A.3d at 533-34.

[12] *See Middaugh v. PennDOT*, 196 A.3d 1073, 1080-82 (Pa. Cmwlth. 2018) (*en banc*).

[13] *See*, *e.g.*, *Hosp. & Healthsys. Ass'n of Pa. v. Commonwealth*, 77 A.3d 587, 603 (Pa. 2013) ("[T]his Court is not tasked with evaluating the wisdom of [the General Assembly's] policy choices."); *Williams v. GEICO*, 32 A.3d 1195, 1204 (Pa. 2011) ("[I]t is not the proper function of this Court to weigh competing public policy interests; rather that task is best suited for the legislature."). Notably, those who would preserve the disparate treatment that prevailed before *Gingrich* rely upon the same policy concerns. Justice Mundy, for example, would continue to honor the arbitrary distinction between judicial and PennDOT delay, relegating the prejudiced driver to bystander status—presumably based upon the same concerns for public safety and specious distinction between the ability to

consequences of interpreting a statute consistently with its unambiguous terms typically are not our concern unless to do so violates a clear constitutional right or command.

The only policy rationale ever ventured for the pre-*Gingrich* discrepant treatment based upon the source of the delay derived from the Commonwealth Court's speculation that strict enforcement of the ten-day limit in each of the sixty Courts of Common Pleas— on peril of returning a convicted driver to the road before the legislature intended—was impracticable. For example, in *Green*, the court explained:

> The principle [that only PennDOT-occasioned delay should be a basis for relief] is consistent with sound policy. Under the Vehicle Code, [PennDOT] is the agency made responsible for imposition of the sanctions which the law uses to keep unsafe drivers off the highways for stated periods. This court has held that a material breach by [PennDOT] of that responsibility will invalidate the legal effectiveness of the sanction. If [PennDOT] too often failed to meet the responsibility thus focused upon it, the locus of the fault would be clear and executive and legislative remedies could be directed at [PennDOT]. But a very different situation would prevail if the effectiveness of the Vehicle Code sanctions became dependent upon scores of court clerks and hundreds of functionaries within the minor judiciary. This court's rule therefore protects the vehicle safety laws from vulnerability to delays within a system where detection and correction of official failure would be much more difficult.[14]

---

police delay in the judiciary and the ability to do so in PennDOT relied upon by the pre-*Gingrich* cases that she endorses. But in a feint even those earlier cases did not rely upon, Justice Mundy further endorses the view that "licensees convicted of DUI can always contact the Department to ascertain the status of their licenses if they are concerned about the delay." Diss. Op. at 2 (quoting *Middaugh*, 196 A.3d at 1090 (Ceisler, J., dissenting)). This approach not only would punish drivers who, lacking the sophistication to know what *should* have happened, would discern no cause to self-report even if they were predisposed to do so, but also would shift the clerk's burden to satisfy his or her duty to the person who finds himself at the law's sharp end. Justice Mundy cites no authority to support putting the onus for identifying and curing government derelictions upon the party in the breach.

[14] *Green*, 546 A.2d at 769; *see Middaugh*, 196 A.3d at 1081 ("Although [Subsection] 6323(1)(i) does contain a 10-day reporting requirement, there was concern that strictly enforcing this requirement by invalidating license suspensions that were not reported within 10 days would undermine public safety."); *PennDOT v. Claypool*, 618 A.2d

Thus, the Commonwealth Court obviated a facially clear statutory mandate that applied to clerks of court because the consequence of adhering to its terms would disserve what it took to be the spirit of the relevant provision, even as it held otherwise with respect to PennDOT delay. Yet the effect of granting relief in the event of delay by either category of actors upon public safety presumably would be the same.

Nonetheless, the Majority correctly observes that what requires a remedy in severe cases of PennDOT delay, where the statute furnishes no way to police such delay or ensure timely action, is the injury to the driver's reasonable reliance upon government actors to fulfill their duties. I find wholly unconvincing PennDOT's suggestion that it suffers some cognizable injury when a dereliction for which it bears no responsibility interferes with its ability to fulfill some standing mandate. PennDOT *has* no unfulfilled mandate until it arises in due course. If a Court of Common Pleas fails to transmit a notice

---

1231, 1233 (Pa. Cmwlth. 1992) ("[T]ying the department's attempts to keep unsafe drivers off the road to the performance of court clerks, over whom the department has no power to supervise or reprimand, is unsound policy."). Notably, no court has ever compared the number of "functionaries" in PennDOT and in the courts who have responsibility for some aspect of the suspension process, the scope of their responsibilities, how thinly they may be spread, or why the executive and legislative remedies available to address PennDOT derelictions are not equaled by similar remedies available to individual Common Pleas Courts' clerks and their President Judges, as well as this Court's broad supervisory authority over the unified judiciary. *See Renner v. Court of Common Pleas of Lehigh Cty.*, 234 A.3d 411, 422 (Pa. 2020); *cf. Middaugh*, 196 A.3d at 1089 (Ceisler, J., dissenting) (asserting that "county court clerks should be accountable for fulfilling their statutorily required reporting obligation," but worrying that "whether an individual's license suspension is sustained depends, in large part, on the caprice, efficiency, and attitude of county court clerks," without considering the prospect that long before *Gingrich* the same was true of PennDOT "functionaries," at least provided their delay was measured in months rather than years). That instances of PennDOT delay and judicial delay alike recur in our case law should militate against harboring undue optimism about Department accountability and internal enforcement.

of conviction, PennDOT has no obligation to meet. Individuals have rights, but PennDOT has only duties.

Viewing PennDOT delay in isolation, it seems clear that absent any semblance of statutory guidance regarding the question of timing and delay, the courts must have the authority to intercede to prevent severe injustice, and even PennDOT implicitly concedes as much.[15] Where the statute in question lacks any facial limitation upon such delay, or any provision that provides for a remedy in the event of delay, it is necessary to look elsewhere for a sound basis to avoid rampant unfairness.

What is less clear to me is the Majority's basis for extending its reasoning to judicially-occasioned delay without substantially accounting for the critical distinction between the Code provisions that delineate the judiciary's and PennDOT's respective statutory duties. The Majority appears to avoid *Gingrich*'s mandatory/directory approach entirely, allowing only that the Code provision setting forth clerks of court's obligation "is mandatory in that it does not leave room for administrative discretion in deciding whether to suspend a driver's operating privileges."[16] But the mandatory/directory distinction lurks as a critical implied premise in the Majority's argument. The time-honored principle of constitutional avoidance dictates that, where a court confronts a question to which a statutory provision furnishes the answer, the court should not resort to a constitutional solution.[17] Thus, to explain its resort to a constitutional solution, the Majority must find

---

[15]  *See* Maj. Op. at 17 (quoting Brief for PennDOT at 14) (conceding that the ten-year delay in *Gingrich* was "too lengthy, regardless of who was at fault").

[16]  *Id.* at 9. The word "directory" does not appear anywhere in the Majority's opinion, even in its review of the Commonwealth case law in which the mandatory/directory distinction looms large.

[17]  *See In re "B," supra*.

the facially mandatory ten-day reporting obligation inadequate to resolve the question before us. Instead, the Majority concludes that the legislature could not have intended to imperil public safety by ensuring that automatic consequences would attach as a matter of law to the unequivocal derelictions of judicial staff unless it spelled out in painstaking detail how delay should be addressed.[18] No matter how you approach it, the Majority's analysis begins from the implied premise that shall does not necessarily mean shall.

I cannot dispute that this Court and others have acknowledged circumstances in which "shall" serves a directory rather than mandatory purpose. We observed over a century ago that "[t]he word shall in its ordinary sense is imperative. But the intent of the act controls, and, when the spirit and purpose of the act require the word shall to be construed as permissive, it will be done."[19] We also once noted an exception to mandatory treatment of "shall" "when relat[ed] to the time of doing something," which at least suggests a basis to uphold PennDOT's interpretation in this case, given that a time limit for action is at issue.[20] More recently still, a plurality of this Court applied the same distinction to reject a strict account of an Election Code provision providing that a voter transmitting his or her ballot by mail "shall . . . fill out, date and sign the declaration printed on" the ballot mailing envelope.[21]

---

[18]    See Maj. Op. at 10-11 ("Given the importance of roadway safety to the traveling public, if this is indeed the General Assembly's intent, it will need to so state in more explicit terms.").

[19]    *Commonwealth ex rel. Bell v. Powell*, 94 A. 746, 748 (Pa. 1915) (cleaned up).

[20]    *Francis v. Corleto*, 211 A.2d 503, 509 (Pa. 1965) (quoting *Borough of Pleasant Hills v. Carroll*, 125 A.2d 466, 468 (Pa. Super. 1956) (*en banc*)) (emphasis in original).

[21]    25 P.S. § 3146.6(a); *see In re Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Election*, ___ A.3d ___, 2020 WL 6866415, at *9 (Pa. Nov. 23, 2020) (Opinion Announcing the Judgment of the Court) ("It has long been part of the jurisprudence of this

The Commonwealth Court in this case cited *Pleasant Hills* for its observation that deeming the word "shall" directory in a given instance does "not mean that it is optional— to be ignored at will. A directory provision . . . must still be followed, but the effect of the noncompliance with that provision would not invalidate the proceedings."[22] As nice as it would be to think that merely knowing that the legislature very much wants a given official to perform a given duty is enough to ensure that he or she will do so, lived experience teaches that a mandate with an incentive structure that comes with an at-best abstract carrot and no stick will not function as a mandate.[23]

Time and again, judicial efforts to impose structure on the mandatory/directory inquiry have revealed that it is all but impossible to do so. In *Pleasant Hills*, for example, the Superior Court suggested that the distinction inheres in "the *effect* of non-compliance . . . . A provision is mandatory when failure to follow it renders the

---

Commonwealth that the use of "shall" in a statute is not always indicative of a mandatory directive; in some instances, it is to be interpreted as merely directory."); *id.* at *11 (holding that to choose whether to apply a mandatory or directory interpretation to the word "shall" the court must "determine whether the intent of the General Assembly was clear" and applying an election-specific balancing test involving whether a voter's failure to satisfy a statutory mandate results in a "minor irregularity" or contravenes "weighty interests"). *But see id.* at *16 (Wecht, J., concurring and dissenting) (noting "my increasing discomfort with this Court's willingness to peer behind the curtain of mandatory statutory language in search of some unspoken directory intent").

[22] *Middaugh*, 196 A.3d at 1081-82 (cleaned up) (citing *Claypool*, 618 A.2d at 1233).

[23] As I recently observed:

> [I]f we are to maintain a principled approach to statutory interpretation that comports with the mandate of our Statutory Construction Act, if we are to maximize the likelihood that we interpret statutes faithfully to the drafters' intended effect, we must read mandatory language as it appears, and we must recognize that a mandate without consequence is no mandate at all.

*Pa. Dem. Party v. Boockvar*, 238 A.3d 345, 391 (Pa. 2020) (Wecht, J., concurring).

proceedings to which it relates illegal and void; it is directory when the failure to follow it does not invalidate the proceedings."[24]   But where, as in this case, we must determine the consequences of a failure to perform a task stated in mandatory language, this distinction begs the question.  We cannot determine what the effect of non-compliance is by asking what the effect of non-compliance is.

> In *Bell v. Powell*,[25] we proposed a somewhat different account:
>
> [Shall] may be construed to mean 'may' when no right or benefit to any one depends on its imperative use, when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to any individual, by giving it that construction, or when it is absolutely necessary to prevent irreparable mischief, or to construe a direction so that it shall not interfere with vested rights, or conflict with the proper exercise of power by either of the fundamental branches of government . . . .
>
> In *Bladen v. Philadelphia*, 60 Pa. 464, page 466 [(Pa. 1869)], Mr. Justice Sharwood said:
>
>> It would not perhaps be easy to lay down any general rule as to when the provisions of a statute are merely directory, and when mandatory or imperative.  Where the words are affirmative, and relate to the manner in which power or jurisdiction vested in a public officer or body is to be exercised, and not to the limits of the power or jurisdiction itself, they may and often have been construed to be directory.[26]

But this passage is as circular as *Pleasant Hills*.  Certainly, directing transmission of a given record "relate[s] to the manner in which [the clerk's] power or jurisdiction . . . is to be exercised,"[27] but whether a clerk retains the authority to transmit a record to PennDOT beyond the ten days afforded by the statute is the question at hand.  The very range and

---

[24]     *Pleasant Hills*, 125 A.2d at 469 (emphasis in original).

[25]     94 A. 746 (Pa. 1915).

[26]     *Id*. at 748 (cleaned up).

[27]     *Id*.

generality of the numerous considerations the *Bell* Court proposed reveals the futility of any effort to circumscribe judicial discretion to distinguish when a textual command is mandatory or directory in the breach. We should not prefer the arbitrariness that comes with unfettered discretion over even an assured result that, in a court's judgment, embodies bad policy, at least when that result is consistent with a common-sense reading of clear statutory language.

But the foregoing discussion pertains only to the Majority's tacit treatment of the express statutory command as less than mandatory in practice. The balance of the Majority's analysis, which proceeds from that premise, is similarly discomfiting to me for reasons I have addressed elsewhere at length.

In questioning the hidden legislative intent that underwrites express statutory language, the Majority reinforces this Court's persistent reliance upon our manifestly flawed decision in *Gambone v. Commonwealth*.[28] Discerning no explicit remedy on the face of the Code for a clerk's patent failure to fulfill his or her duty in the time allotted, and declining to give life to the Code's language by choosing to deem a tardy judicial report invalid for want of statutory authority, the Majority turns instead to substantive due process principles. Noting that this move informed the Commonwealth Court's decision in *Gingrich*, the Majority correctly observes that the court's reasoning in that case "implicated a rational-basis inquiry" that the lower court in this case made express.[29]

The Majority expands upon the lower court's approach by invoking the United States Supreme Court's endorsement of a "means-ends assessment for purposes of the

---

[28] 101 A.2d 634 (Pa. 1954).

[29] Maj. Op. at 11-12.

Fourteenth Amendment's Due Process Clause,"[30] which finds its corollary in this Court's own discernment of "substantive due process" principles under Article I Section I of the Commonwealth's own Constitution.[31] The Majority then explains that in certain "outlier" situations, "due process norms can be invoked to restrain enforcement of a law under the circumstances where it appears that the targeting of the particular person or entity in question will do little to achieve the evident legislative objective."[32] The numerous imprecise terms in this one excerpt demonstrate precisely why I have repeatedly voiced my concern with the invocation of substantive due process to license our departure from statutory language in service of judicial assessments of hidden legislative intent or, worse, our own perception of salutary public policy.[33] "The legislature *couldn't* have intended that result" is seldom a suitable basis for an interpretation at odds with the statutory text.

---

[30]     *Id.* at 12 (citing *Nebbia v. New York*, 291 U.S. 52 (1934)).

[31]     *See* Pa. Const. art. I § 1 ("All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."); *see also* Maj. Op. at 12-13.

[32]     Maj. Op. at 13.

[33]     *See Shoul v. PennDOT*, 173 A.3d 669, 688-92 (Pa. 2017) (Wecht, J., concurring) (citing this Court's persistent reliance upon *Gambone*, and by extension its tacit embrace of the United States Supreme Court's reasoning in *Lochner v. New York*, 198 U.S. 45 (1905), for its intrusive account of rational basis-review as having resulted in the doctrine's "amorphous and inconsistent application," and observing that, "[a]lthough we are of course the arbiters of constitutionality, we do no violence to that role when we defer prudentially to legislative policymaking"); *see also Ladd v. Real Estate Comm'n of the Commonwealth*, 230 A.3d 1096, 1116-1123 (Pa. 2020) (Wecht, J., dissenting) (expanding upon the same concerns). As I noted in *Shoul*, shortly after our decision in *Gambone* embraced a *Lochner*-inflected account of substantive due process, the United States Supreme Court began substantially to chip away at *Lochner*'s expansive account of judicial authority to second-guess legislative judgments. *See Shoul*, 173 A.3d at 690 (reviewing this evolution away from *Lochner*, beginning with *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955)). Nonetheless, in myriad cases, most recently *Shoul* and *Ladd*, this Court has reified the *Gambone* doctrine for a half century past the expiration of the shelf life of the cases that nourished it.

I do not disagree that such protections serve an important function in circumstances of gross unfairness in which no colorable reading of the applicable statute offers any recourse. That is why I agree generally that our decision in *Terraciano*, providing for relief from truly excessive and unexcused PennDOT-occasioned delay in imposing a mandatory suspension, is sound. The only alternative to our ruling in that case would be to allow PennDOT absolute impunity, no matter how much harm it causes those whose lives are destabilized by its inaction. But the Majority does not invoke substantive due process to protect the individual against government overreach, but rather to protect the general public against the vicissitudes of a statutory provision that, rigorously interpreted, protects the individual—in a sense, protecting the legislature from itself.

My principal concern, here and elsewhere, is the resort to such an imprecise doctrinal framework[34] to avoid outcomes a Majority of justices deems undesirable—here the prospect that some irresponsible licensees will remain on the road because a clerk failed to discharge his or her prescribed statutory duty. Our constitutional design,

---

[34] As is often true in cases relying upon substantive due process to interrogate the legislature's "true" intent, the Majority's analysis is replete with qualitative terms that read as an invitation to broad judicial discretion. *See* Maj. Op. at 12 (quoting the Court's *Lochner* era decision in *Nebbia*, 291 U.S. at 525) (state law must have a "real and substantial relation to the object sought to be attained"), 13 (identifying outlier cases as "those that depart substantially from the ordinary and expected application of a law," and citing judicial authority to preclude enforcement of the law where "it appears that the targeting of the particular person or entity in question will do little to achieve the evident legislative objective"), 14 ("[T]he government must treat individuals "with basic fairness"). Of course, courts long have recognized fairness as a quality within courts' province to discern under certain circumstances. My point is merely that because these terms are so elusive, and so readily invite arbitrariness, they should be a last resort for use only in cases in which no statute offers a tangible basis for decision.

specifically the separation of powers, vests the legislature with the power to conduct precisely the sort of balancing of interests that the Majority undertakes here.

The canonical "outlier" case described by the Majority should be one that requires the application of judge-made law for want of *any* plausible statutory alternative, precisely the circumstances presented by PennDOT delay. But the time-limited mandate the Code imposes upon clerks provides a reasonable alternative to protect against such abuses without resorting to constitutional analyses. Upon the clerk is imposed a certain duty arising from a triggering event, *i.e.*, the transmission to PennDOT of proof of a conviction of a predicate crime under the Vehicle Code, which in turn activates PennDOT's statutory duty to effectuate a mandatory suspension. Thus, the scope of a clerk's obligation is circumscribed by a clear ten-day time limit. Not only does nothing in the statute suggest that the clerk has a duty to report such a conviction *after* the passage of ten days, nothing in the statute compels the conclusion that any authority to do so survives beyond that time limit's expiration.[35]

---

[35] In this regard, arguably, the better constitutional fit may be procedural due process. The legislature has set forth specific procedures to be followed before a suspension may be imposed, the first step of which is a predicate conviction and the second of which is transmission of notice to PennDOT by a time certain. Failure to comply within the time limit patently falls outside the legislature's grant of authority. Accordingly, a clerk's attempt to exercise that authority past the time limit lacks statutory authorization, and is void *ab initio*. *Cf. generally Luke v. Cataldi*, 932 A.2d 45, 51 (Pa. 2007). Consequently, no duty or authority ever vests in PennDOT to impose the suspension. If official action is void *ab initio*, no explicit remedy need be specified because the remedy is self-evident. To be clear, this argument has never been considered in this case, is not presented now, and is unnecessary to my rejection of the Majority's invocation of substantive due process. As I argue throughout this Opinion, to say that official authority to perform a statutorily-authorized act expires at the conclusion of the time allotted for doing so does not require resort to constitutional principles.

This may not be the most appealing reading of the Code. This may, indeed, not be consistent with the actual will of some or all of the legislators who drafted and voted in support of these provisions. And the consequences may well prove unfortunate. But it would hardly be the first time unfortunate consequences followed from imperfect legislation. It is not our burden or our privilege to ask the constitution questions that have statutory answers.

Indeed, the legal basis to do so is at its nadir where, as here, a reasonable reading of the statute *ensures* the very fairness to the potentially injured party that we usually invoke substantive due process to protect. The Majority's laudable effort to provide a mechanism for relief to licensees harmed by prejudicial government lassitude would be served simply by reading the statute according to its terms. Thus, the Majority's resort to substantive due process does not protect a licensee otherwise defenseless against harms occasioned by government neglect. Rather, it tilts the scales *away* from the driver's interest in the punctilious discharge of government duties (which interest the general public shares) in the name of public safety.

Certainly, it would be preferable for the General Assembly to prescribe both clear time limits to all stages in the suspension process *and*, as it has in other contexts, to specify consequences that follow a government office's failure to comply with those time limits.[36] But if wishes were horses, beggars would ride. Instead, the legislature has left

---

[36]   *See* 75 Pa.C.S. §§ 1535(c) (providing that any points PennDOT attempts to apply to a licensee's driving record more than six months after the underlying conviction are "null and void"), *Id.* § 1541(a) (authorizing a court to stay the effect of a mandatory suspension during the pendency of an appeal upon a showing of hardship). For example, the General Assembly might provide that the period of suspension begins to run at the expiration of ten days regardless of whether notice has been served, but that only upon

the judiciary with an understandably stringent limit for transmitting proofs of conviction—one that, in its stringency, serves both the public's interest in road safety and convicted drivers' interests in clarity and timeliness. It is incumbent upon this Court to interpret statutes to give meaning and effect to all of their constituent parts. If no consequence befalls a clerk who falls down on the job, the statutory mandate is aspirational at best.

Nonetheless, my reading of the statute leads me to concur in the result reached by the Majority. In light of the clerk's delay in relaying notice of Middaugh's conviction to PennDOT for suspension, the suspension cannot stand under the Vehicle Code. But I dissent from the unnecessary resort to due process that the Majority prescribes moving forward.

Justice Todd joins this concurring and dissenting opinion.

---

notice will the licensee's privilege be suspended. Thus, in the case of a one-year suspension, ten days after the judgment of sentence is entered, the one year clock begins to run. If the licensee does not receive notice until six months have passed, then his or her privileges will be suspended only for the remaining six months of that period.