**[J-27-2023] [MO: Brobson, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| J.C.D, III AND A.M.D., | : | No. 13 MAP 2023 |
| | : | |
| Appellees | : | Appeal from the Order of the |
| | : | Superior Court at No. 1449 MDA |
| | : | 2022 dated November 14, 2022 |
| v. | : | Quashing the appeal from the York |
| | : | County Court of Common Pleas, |
| | : | Domestic Relations, order dated |
| A.L.R. AND T.A.D.-R., | : | October 6, 2022, at No. 2022-FC- |
| | : | 1432-03. |
| Appellants | : | |
| | : | ARGUED:  May 23, 2023 |

**CONCURRING OPINION**

**JUSTICE WECHT**                                     **DECIDED:  October 18, 2023**

I.

The Supreme Court of the United States has long recognized Americans'
fundamental right to raise their children as they see fit.  A century ago, at the height of
the *Lochner* era,[1] that Court announced that the Fourteenth Amendment's due process
clause "denotes not merely freedom from bodily restraint but also the right of the individual
to contract, to engage in any of the common occupations of life, to acquire useful
knowledge, to marry, establish a home and bring up children, to worship God according

---

[1]      The *Lochner* era was a period in the United States Supreme Court's history —
taking its name from the decision in *Lochner v. New York*, 198 U.S. 45 (1905) — that
extended into the 1930s and was characterized by the Court's invocation of the due
process clause to strike down laws regulating economic affairs.  *See Bert Co. v. Turk*,
298 A.3d 44, 88-89 (Pa. July 19, 2023) (Wecht, J., concurring).

to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."[2]

More recently, in *Troxel v. Granville*, the United States Supreme Court reiterated that the due process clause of the Fourteenth Amendment "includes a substantive component" that protects "the interest of parents in the care, custody, and control of their children."[3]  In *Troxel*, the paternal grandparents, whose son had died, sought visitation with their grandchildren.  They sued the children's mother under a Washington statute which stated broadly that any person could petition for visitation rights at any time and which authorized the trial court to grant visitation to such persons when visitation would serve the best interests of the child.  The Supreme Court of Washington found the statute to be facially unconstitutional in part because the statute interfered with a parent's

---

[2]    *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  *See also Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Parham v. J. R.*, 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.  Our cases have consistently followed that course; our constitutional system long ago rejected any notion that a child is the mere creature of the State and, on the contrary, asserted that parents generally have the right, coupled with the high duty, to recognize and prepare [their children] for additional obligations. . . . The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.  More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.") (internal citations and quotation marks omitted).

[3]    530 U.S. 57, 65 (2000).  The lead opinion in *Troxel* was authored by Justice O'Connor and was joined by three other Justices.  Justice Souter concurred in the result, agreeing that the Fourteenth Amendment protects a parent's interest in raising one's children.  *Id.* at 77.  Justice Stevens and Justice Kennedy dissented, but they nonetheless identified the Fourteenth Amendment as the source of the liberty interest.  *Id.* at 86-87, 95.  Hence, a majority of Justices held that the rights of parents in the "care, custody, and control of their children" are grounded in substantive due process.

fundamental right in the care, custody, and control of the parent's children.[4]  On appeal, the United States Supreme Court agreed that, as applied to the parent in the case, the Washington statue "unconstitutionally infringe[d] on that fundamental parental right."[5]  "So long as a parent adequately cares for his or her children (*i.e.* is fit)," the Court stated, "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children."[6]  The Court announced that "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made."[7]

Soon after *Troxel*, this Court decided *Hiller v. Fausey*.[8]  In that case, the maternal grandmother, whose daughter had died, sought partial custody of her grandson by suing the child's father pursuant to 23 Pa.C.S. § 5311.[9]  The father challenged the grant of partial custody as a violation of his substantive due process rights guaranteed by the

---

[4]  *Id.* at 63.

[5]  *Id.* at 67.

[6]  *Id.* at 68-69.

[7]  *Id.* at 72-73.

[8]  904 A.2d 875 (Pa. 2006).

[9]  23 Pa.C.S.§ 5311 (repealed) stated:

> If a parent of an unmarried child is deceased, the parents or grandparents of the deceased parent may be granted reasonable partial custody or visitation rights, or both, to the unmarried child by the court upon a finding that partial custody or visitation rights, or both, would be in the best interest of the child and would not interfere with the parent-child relationship. The court shall consider the amount of personal contact between the parents or grandparents of the deceased parent and the child prior to the application.

Fourteenth Amendment.[10]   Reviewing *Troxel*, this Court noted that a majority of the United States Supreme Court had determined that there was "a constitutionally protected right of parents to make decisions concerning the care, custody, and control of their children," a right that includes deciding the appropriateness of visitation with third parties, and had concluded that "fit parents are entitled to a presumption that they act in the best interests of their children."[11]   This Court held that, *Troxel* notwithstanding, the Pennsylvania statute satisfied strict scrutiny and was therefore constitutional because it sufficiently protected parents' fundamental substantive due process right to raise their children.[12]

As I recently noted elsewhere, and in more detail, I have serious doubts about the jurisprudential wisdom of laboring creatively to mine unenumerated rights in the ore of the Fourteenth Amendment's Due Process Clause, a clause that safeguards procedural rights but does not, by its terms, manufacture substantive liberties.[13]   Instead, it is the Ninth Amendment, which recognizes that the enumeration of certain rights in the Constitution should not be construed to deny or disparage other rights retained by the people, and the Fourteenth Amendment's Privileges or Immunities Clause, which (properly read) also protects unenumerated rights, that serve as far more solid foundations for the protection of our liberties.[14]   Unfortunately, these important domains of constitutional law largely have been ignored and neglected due to the confusing muddle of the United States Supreme Court's substantive due process jurisprudence.

---

[10]    *Id.* at 879.

[11]    *Id.* at 883.

[12]    *Id.* at 890.

[13]    *See Bert Co.*, 298 A.3d at 86-95 (Wecht, J., concurring).

[14]    *Id.* at 95-102.

Judges and lawyers should explore the Ninth Amendment and the Privileges or Immunities Clause so that those provisions may ripen over time into a proper jurisprudential foundation for protection of important but unenumerated rights, including the right of parents to raise their children.

It is puzzling as well that few turn to the Pennsylvania Constitution as a source of protection for our fundamental rights and liberties. Instead, the universal default continues to be reflexive invocation of federal "substantive due process rights." In Pennsylvania cases involving the right to parent, such as *Hiller* and *D.P. v. G.J.P.*,[15] neither the litigants nor this Court cited the Pennsylvania Constitution as a source of the right, relying instead upon the Fourteenth Amendment. To some extent, this is understandable, inasmuch as Pennsylvania's Constitution does not contain the due process provision upon which *Troxel* relied. Instead, Article 1, Section 1 of our Commonwealth's charter[16] has been repeatedly (but largely unthinkingly) crammed into an interpretive equivalency with the Due Process Clause of the Fourteenth Amendment, notwithstanding the lack of any textual basis for equalizing the procedural rights of the latter with the obviously substantive rights of the former.[17] With respect to vindication of

[15]     146 A.3d 204 (Pa. 2016).

[16]     "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." PA. CONST. art. I, § 1.

[17]     *See, e.g., Shoul v. Pa., Dep't of Transp., Bureau of Driver Licensing*, 173 A.3d 669, 676 (Pa. 2017) (citing Article 1, Section as the state counterpart to the due process clause of the Fourteenth Amendment); *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004) (defining substantive due process as an "esoteric concept interwoven within our judicial framework to guarantee fundamental fairness and substantial justice," and citing Article 1, Section 1 as the source of protection for the interest in practicing one's profession); *Nixon v. Commonwealth*, 839 A.2d 277, 286 (Pa. 2003) ("[Article 1, Section (continued…)

process rights (including, *inter alia*, protection of "remedy by due course of law"), our law should more properly refer to Article I, Section 11 of our Pennsylvania Constitution. But that is a matter for another day.

As a result of the prevailing jurisprudential paradigm, when claims alleging deprivation of a constitutionally protected interest are brought under the Pennsylvania Constitution, this Court has analyzed them under a two-part rubric: strict scrutiny when a fundamental interest is at issue, and rational basis review when a "protected but not fundamental right" is impacted.[18,19] Because the protection of fundamental rights under the Pennsylvania Constitution has not yet been well-developed or properly articulated, there is no exhaustive list of those rights that warrant strict scrutiny. However, in the *Nixon* case, this Court did identify the right to privacy, the right to marry, and the right to procreate as examples.[20] It would be a small step rather than a leap to conclude that the right to raise one's children and to direct the care, control, and custody of those children is among those fundamental rights protected by the Pennsylvania Constitution. There's no need to insist on hammering the federal "due process" moniker onto these rights, which are among the "liberty" and "happiness" rights recognized as "inherent rights of mankind" by our own Article I, Section 1 constitutional text.

---

1], like the due process clause in the Fourteenth Amendment of the United States Constitution, guarantees persons in this Commonwealth certain inalienable rights.").

[18]    *Germantown Cab Co. v. Philadelphia Parking Authority*, 206 A.3d 1030, 1042 (Pa. 2019).

[19]    I leave to another day further discussion of my disagreement with the peculiar development and application of the rational basis test in Pennsylvania jurisprudence. *See Shoul*, 173 A.3d at 688-94 (Wecht, J., concurring).

[20]    *Nixon v. Commonwealth*, 839 A.2d 277, 287 (Pa. 2003).

## II.

As the Majority acknowledges, while this case involves the assertion of a constitutional right, no one has directly challenged the constitutionality of the statute.[21] In *D.P.*, this Court weighed the constitutionality of a statute that provided grandparents with standing in custody cases when the parents had been separated for six months. There, although the parents were separated, they agreed nonetheless that their children should not have contact with the grandparents. In response, the grandparents filed a complaint for partial custody. The trial court ruled that the statute burdened the parents' fundamental liberty interest and that the statute was not sufficiently narrowly-tailored because, as this Court noted, "it improperly assumes, based solely on the parents' separated status, that their joint decisions regarding the raising of their children are infected by a degree of unfitness."[22] This Court stated that the right of parents to make decisions concerning their children was a fundamental right protected by the Due Process Clause of the Fourteenth Amendment.[23] Considering that the family was not involved in the court system and that the parents, notwithstanding their separation, agreed that the grandparents should not be involved with the children, we "conclude[d] that the fact of a parental separation for six months or more does not render the state's *parens patriae* interest sufficiently pressing to justify potentially disturbing the decision of presumptively

---

[21]    Maj. Op. at 15.

[22]    *D.P.*, 146 A.3d at 207. The parents also raised an equal protection argument, but this Court did not reach it. *D.P.*, 146 A.3d at 216 n.18. However, the trial court found that argument compelling. It relied upon Superior Court case law which held that a grandparent did not have standing to pursue custody when the parents were part of an intact family (based on prior iterations of the standing statute), and it concluded that "there was no constitutionally sound basis to support a classification whereby married parents who are separated should be treated differently [than intact married parents]." *Id.* at 207.

[23]    *Id.* at 210.

fit parents concerning the individuals with whom their minor children should associate."[24] Accordingly, this Court determined that the provision which granted standing to grandparents when the parents had been separated was unconstitutional.

Although *D.P.* analyzed a prior version of the grandparent standing statute, the factual similarities between that case and the one we address here certainly raise a question as to the constitutionality of the statute that we consider today. Here, the parents agree about the lack of contact between the grandparents and the grandchildren. What is more, the parents here maintain an intact family, and they have not invited court intervention into their family. If an actual separation was insufficient to justify state interference with the parents' right to care, control, and custody of their children in *D.P.*, it seems unlikely that the decision of presumptively fit parents in an intact relationship constitutionally could be subject to such interference.

III.

Nonetheless, as previously noted, no challenge, whether facial or as applied, has been raised regarding the constitutionality of the statute implicated in this case. Instead, we are charged only with determining whether the order finding that the grandparents have standing is appealable on an interlocutory basis.

Our General Assembly has made the policy decision that grandparents have a place of importance in children's lives and, accordingly, has chosen to provide them with standing to pursue custody. Two statutes confer such standing. Section 5324 provides standing to grandparents to pursue any form of physical or legal custody when the relationship with the child began with the consent of the parent or under a court order and the grandparent is willing to assume responsibility for the child, and also when the child

---

[24]    *Id.* at 215.

is either dependent, at risk, or has lived with the grandparent for at least twelve consecutive months.[25]  Section 5325 grants standing for grandparents to pursue partial physical custody in three scenarios: when the grandparent's child (the child's parent) is deceased; when the parents of the child are engaged in custody proceedings, do not agree on the grandparents' custody, and the grandparents have a prior relationship with the child that began by parental consent or court order; or when the child has lived with the grandparent for at least twelve consecutive months.[26]  In a prior iteration of the custody scheme, the General Assembly had specifically expressed a public policy of ensuring continuing contact between children and their grandparents when their parents are deceased, divorced, or separated.[27]  As evidenced by the two statutes that currently provide for grandparent standing, the General Assembly has left no reason to doubt that it continues to favor a policy that fosters continuing contact between children and their grandparents.

IV.

In the case we confront today, the trial court concluded that the grandparents have standing to pursue custody.  This was not a final order.  Accordingly, as the Majority correctly notes, a party seeking to appeal must establish that the order satisfies the requirements of Pa.R.A.P. 313.[28]  A collateral order is one "separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the

---

[25]     23 Pa.C.S. § 5324.

[26]     23 Pa.C.S. § 5325.

[27]     *See* 23 Pa.C.S. § 5301 (repealed).

[28]     *See* Maj. Op. at 4-5.

case, the claim will be irreparably lost."[29] The parties agree that the first two elements — that the order is separable from the main cause of action and that the right involved is too important to be denied review — are satisfied here. The only question is whether the claim will be irreparably lost if its resolution is delayed. I agree with the Majority's conclusion that the parents' reliance upon *K.C. v. L.A.*, 128 A.3d 774 (Pa. 2015), is misplaced.[30] I agree as well that the parents cannot rely simply upon assertions that their right to raise their children is burdened in order to demonstrate that their claim will be irreparably lost in the meantime.[31]

With respect to the final element of the collateral order doctrine, irreparable loss generally has been applied to issues of privilege.[32] This Court has focused upon the cost of litigation on at least one occasion, but that ruling was premised upon federal law supporting a clear policy of cost containment in aviation litigation.[33] In another case, this

---

[29] Pa.R.A.P. 313(b).

[30] Maj. Op. at 8-10.

[31] *Id.* at 10-11.

[32] *See*, *e.g.*, *In re Estate of McAleer*, 248 A.3d 416, 425 (Pa. 2021) (concluding that the protection of confidential materials would be irreparably lost); *Commonwealth v. Williams*, 86 A.3d 771, 784 (Pa. 2014) (finding irreparable loss because, "once the prosecutor's notes are disclosed, the disclosure cannot effectively be undone"); *Commonwealth v. Kennedy*, 876 A.2d 939, 944 (Pa. 2005) (holding that a challenge to disclosure of work-product would be irreparably lost); *Ben v. Schwartz*, 729 A.2d 547, 552 (Pa. 1999) ("[T]here is no effective means of reviewing after a final judgment an order requiring the production of putatively protected material.")

[33] *Pridgen v. Parker Hannifin Corp.*, 905 A.2d 422, 433 (Pa. 2006) ("[W]e conclude that the substantial cost that Appellants will incur in defending this complex litigation at a trial on the merits comprises a sufficient loss to support allowing interlocutory appellate review as of right, in light of the clear federal policy to contain such costs in the public interest.").

Court considered the cost of litigation in an immunity claim, but also recognized that the "interests sovereign immunity protects are not entirely pecuniary."[34]

Here, the parents suggest that the time and cost burdens attendant to custody litigation impinge on their rights to parent, and that this burdening represents irreparable harm. Both this Court and the Supreme Court of the United Stated have noted the burdens associated with child custody litigation.[35] And we have noted that revisions to our custody statutes have separated standing and merits so as to afford "parents the ability to bifurcate the proceedings by seeking dismissal for lack of standing, thereby requiring that any such preliminary questions be resolved before the complaint's merits are reached."[36] We have opined that such bifurcation also serves to protect parental rights by providing a mechanism for dismissal at an early stage, "thereby relieving families of the burden of litigating . . . merits where a sufficient basis for standing is absent."[37] Nonetheless, these observations addressed the litigation process in the trial court, not the question of whether the litigation burden sufficed to qualify as irreparable loss for collateral order purposes. In *D.P.*, this Court did not address appealability or the collateral order doctrine because the trial court there had found the statute to be unconstitutional,

---

[34] *Brooks v. Ewing Cole, Inc.*, 259 A.3d 359, 375 (Pa. 2021).

[35] *See*, *e.g.*, *Troxel*, 530 U.S. at 75 ("the burden of litigating [custody] can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations of the child's welfare becomes implicated'") (quoting *Troxel*, 530 U.S. at 101 (Kennedy, J. dissenting)); *Hiller*, 904 A.2d at 886 & n.20 (in discussing whether the statute was narrowly tailored, this Court stated, "we cannot conclude that such a benefit always accrues in cases where grandparents force their way into grandchildren's lives through the courts…." and recognized the "strain that custody litigation places on the children as well parents and grandparents.").

[36] *D.P.*, 46 A.3d at 213.

[37] *Id.*

which ruling prompted a direct appeal to this Court.[38]  The *D.P.* Court cited *Troxel* for the proposition that custody litigation "can itself impinge upon parental rights."[39]  But neither *D.P.* nor *Troxel* spoke to the issue that is before us today.

Rather than a claim of irreparable loss, the parents' complaint brings to mind "the type of inconvenience which any litigant might suffer. . . ."[40]  If the standing decision is appealable only after a final order is entered, the parents must expend the time, money, and energy necessary to reach that point.  But that is true in every case.  If expenditure of resources when such expenditure could be avoided through an interlocutory appeal sufficed for Rule 313 purposes, then every interlocutory order presumably would satisfy the irreparable loss prong of the collateral order rule.  The exception would devour the rule.

The claim here is not akin to the claims of privilege or immunity that have justified collateral order appeals.  This Court has not held that the burden of litigation alone is sufficient to show that a claim will be irreparably lost.  The Majority is correct in concluding that this is not a collateral order.[41]


V.

In affirming the Superior Court's order here, the Majority aptly observes that "our decision today may be inconsistent" with a previous Superior Court decision in an unrelated case, *K.W. v. S.L.*, 157 A.3d 498 (Pa. Super. 2017).[42]  In *K.W.*, the Superior

---

[38]     *See* 42 Pa.C.S. § 722(7).

[39]     46 A.3d at 213 (citing *Troxel*, 530 U.S. at 75).

[40]     *Shearer v. Hafer*, 177 A.3d 850, 860 (Pa. 2018).

[41]     Maj. Op. at 15.

[42]     *See* Maj. Op. at 16 n.8.

Court concluded that an order granting prospective adoptive parents standing was appealable on an interlocutory basis as a collateral order. The Superior Court concluded there that the father's claim would otherwise be irreparably lost because allowance of additional custody litigation without a resolution of the standing issue would burden the father's right to parent his child. Citing *D.P.*, the Superior Court concluded that the right to parent included "the right to be free of custody litigation involving third parties."[43] For the Superior Court, this included consideration of the "substantial financial burden" and the loss of "months of time caring for and bonding with" the child.[44]

As we often have stated, "the holding of a judicial decision is to be read against its facts."[45] The facts of *K.W.* were atypical, and arguably distinguish that case from the circumstances before us today. In *K.W.*, the father was not informed of the mother's pregnancy, nor of the fact that she had placed the child for adoption. The child was placed with adoptive parents before the father was even aware of the child's existence. The adoption agency attempted to contact the father and was first able to do so a month after the child's birth. Various procedural issues delayed the case, and the father's preliminary objections to standing were not finally resolved until the child was about one year old. In permitting the interlocutory appeal, the Superior Court weighed "the unique circumstances" including the fact that the father "was deprived of [the child] by a private adoption agency without the benefit of a hearing or other due process protections" and that the court "could not hope to fully vindicate or restore [the father's] rights by the time of his second appeal."[46] The Superior Court's language in holding the standing order to

---

[43]     *K.W.*, 157 A.3d at 504.

[44]     *Id.*

[45]     *Lance v. Wyeth*, 85 A.3d 434, 453 (Pa. 2014).

[46]     *K.W.*, 157 A.3d at 504.

be appealable on an interlocutory basis may have swept more broadly than necessary, but it was undeniable in that case that the father was deprived at length of his right to direct the care, custody, and control of his child.

Those facts are very different from those of today's case. Here, Parents maintain custody of Children. As such, even if our Court was bound by the Superior Court's rationale (which, of course, we are not), *K.W.* would not control.[47]

\* \* \* \*

The order *sub judice* is not a collateral order within the meaning of Rule 313. I join the Majority Opinion.

---

[47] To the extent that *K.W.* is not distinguishable, I would disapprove of it. The Majority does not specifically decide that *K.W.* is (or is not) distinguishable. Instead, it "see[s] no reason to disapprove of *K.W.* at this time" because the parties here have not addressed the case. Maj. Op. at 16 n.8. Under the circumstances, I take no exception to this exercise of restraint.